J.L. Williams, the appellant, was arrested in Calhoun County for the offense of first degree murder. He was indicted and arraigned with his attorney present. The appellant entered a plea of not guilty by reason of insanity. On September 1, 1976, he was confined, pursuant to a court order, to Bryce Hospital for a mental examination.
On April 14, 1978, the appellant was returned to the Calhoun County jail after being evaluated by Bryce Hospital authorities as "restored to his right mind." After a jury trial on November 30, 1978, the appellant was found guilty of murder in the second degree and was sentenced to life imprisonment.
The facts presented by the State were not in dispute and were sufficient to make out a prima facie case. Those facts are that on January 28, 1976, Hilda E. Nelson had rented the upstairs rooms of her home to the appellant and his brother, Alfred Williams. Around noon on that date, she heard a noise upstairs which sounded as if people were fighting or scuffling on the floor. Later she heard something hit the floor and then heard a shot. Subsequently, the appellant came downstairs and called the police. After the police and an ambulance arrived, Mrs. Nelson went upstairs and saw Alfred Williams, who had been shot, lying on the floor.
According to Mrs. Nelson, the appellant had lived in the upstairs apartment for approximately a year, and his brother had been there for four years. During the year that both men lived there, she had not witnessed any difficulties between the brothers. Mrs. Nelson recalled that the deceased *Page 507 
was a taxi driver who owned a gun. She indicated that she was unaware of the fact that the appellant had been a patient in a mental hospital.
Carlos Lamar Raybren, Toxicologist for the State of Alabama, performed an autopsy on the body of the deceased. His examination revealed that the cause of death resulted from massive bleeding within the abdominal area which was associated with a gunshot wound in the left side of Williams' back. During the examination, Raybren recovered a bullet projectile which was marked and turned over to Ralph Phillips.
Ralph Phillips, the Coroner of Calhoun County, responded to a call at 1120 Quintard Avenue where he saw the body of the deceased. He examined the body and determined that the victim was dead as a result of being shot in the back.
The body was removed by a rescue squad and taken to a funeral home. Later the body was removed to Auburn for an autopsy. On January 29, 1976, the morning after the autopsy, Phillips received a projectile which had been taken from the body. He delivered the projectile to John Case in Jacksonville, Alabama.
Anniston Police Officer John Stubbs responded to a call at Mrs. Nelson's house at 1120 Quintard. On his arrival, he found the dead body of Alfred T. Williams at the head of the stairs. The identity of the victim was disclosed by the appellant. After the appellant admitted that he had fired the shot, Stubbs placed him under arrest and informed him of his constitutional rights. After being informed of his rights, the appellant "shook his head, nodded his head" that he understood those rights.
Stubbs recovered from the upstairs rooms two weapons, a .22 automatic and a .25 automatic, both of which he turned over to Hughes.
Captain Jack Hughes, a homicide detective with the Anniston Police Department, investigated the shooting at 1120 Quintard Avenue. On arrival he found, on the front stairs, second floor, the dead body of a white male, lying face down. The man appeared to have been shot in the back.
During that time, Officer Hughes received from Stubbs two pistols and a shell case. Hughes later recovered a blanket. These items were turned over to Captain Ezell and were taken to the crime lab the next day.
Hughes, before speaking to the appellant, informed him of his constitutional rights. The witness stated that the appellant appeared to be lucid. According to Hughes, the appellant refused to give a written statement, but he did make an oral statement. In that statement, the appellant said that "his brother had not been treating his ex-wife right and had not been paying his child support and he had to do something about it, and so he shot him." At that time, Hughes requested a written statement of the appellant, but the appellant said "that he wanted to get a lawyer or talk to a lawyer." Consequently, Hughes discontinued the questioning. The witness was "a little curious" about the appellant's mental state; however, Hughes said, "It seems unusual when anybody kills somebody to me."
Hughes, during his investigation, talked to the appellant's brother, G.B. Williams, and was informed that the appellant had been recently released from a mental institution somewhere in the Midwest. Regarding the appellant, Hughes recalled, "At the time I talked with him, he was — I think he knew what he was doing — I can't say whether he was sane or insane. I said I think he knew what he was doing."
John M. Case, a criminalist with the Alabama Department of Forensic Sciences in Jacksonville, Alabama, received a manila envelope from Hughes on January 29, 1976. The package contained a Titan .25 caliber automatic pistol, seven live automatic caliber cartridges, one spent .25 automatic cartridge casing, a clip from a .25 automatic Titan pistol, an I.M.P. brand Model .7222 short caliber revolver, a red blanket, and a vial of blood which was identified as coming from Alfred T. Williams. On the blanket, Hughes had found several stains which were positively identified as bloodstains. The blood in the vial was analyzed and was *Page 508 
found not to contain ethyl alcohol. Hughes had compared the bullet coming from the body with those he had test fired from the .25 automatic and found that the "evidence bullet" taken from the body of the deceased had been fired from a .25 automatic pistol.
At the conclusion of Case's testimony, the State rested its case, and the defense moved to exclude the State's evidence and for a directed verdict. The court, stating that it was a jury question, denied the motion. The defense made further objection on the grounds that the defendant was presently insane and was not able to comprehend the proceedings or to aid in his defense. The court denied that motion also and said, "Well, unless something has changed since tomorrow — since yesterday, I have already ruled on that and I'll deny that motion."
The appellant did not take the stand, but called his brother, G.B. Williams. G.B. Williams had been the appellant's guardian for a number of years. According to Williams, he had noticed his brother's behavior when the appellant was discharged from the Army in 1954. The appellant was committed to the Veteran's Hospital in July, 1956, where he remained for ten years. In 1966, when he was released, he had gone to Lawrence County and while there had scared an aunt with a gun. The scare resulted in the aunt suffering a heart attack. After that incident, the appellant was taken to the county jail in Moulton, Alabama, where he remained for two or three months. Later he was declared incompetent and was sent to the Veteran's Administration Hospital in Tuscaloosa, Alabama, in 1967. The appellant was transferred to St. Elizabeth's Hospital in Washington, D.C., where he remained for a few months. He was subsequently taken to Topeka, Kansas, Veteran's Hospital until 1971 when he was sent to the Lawrence State Mental Hospital, Lawrence, Kansas. The appellant remained in the mental institution until Christmas of 1975 when G.B. Williams arranged for him to get his necessary medication through the Mental Health Center in Birmingham, Alabama.
According to Williams, he got his brother a room at the Quintard address because being around children upset the appellant. Williams had been told by the appellant that he had experienced dreams in which he had "cut up" children. Williams testified that in his opinion his brother, at the time of the shooting, was not of sound mind. Williams felt that the appellant should be hospitalized.
During further questioning, the witness stated that the appellant had, from 1954 until the present, spent all but two years in a mental institution.
Dr. Samuel J. Crawford, a psychiatrist, first saw the appellant in June, 1975. Crawford testified that he had seen the appellant at the Mental Health Center on a couple of occasions and that, during the time he was in jail, he had been seen by someone from the Mental Health Center on a weekly basis. Treatment continued until the appellant was committed to Bryce Hospital in June or July, 1976. In Dr. Crawford's opinion, the appellant was "completely psychotic." Crawford stated, "By that I mean he was incapable of dealing with appropriate functions in any manner. He was delusional, completely out of contact with reality and pretty much remained so throughout the entire period of time. The patient was diagnosed at that point as a paranoid schizophrenic." A paranoid schizophrenic, according to Dr. Crawford:
 "[H]as constant feelings that everything around him, the people, buildings or anything is out to get him, out to do him in. Consistently feels that there is no positive action whatsoever. Everything about it, about his own input is a negative kind of feeling, so that they constantly react to all those feelings. They react against them and that basically is what a paranoid schizophrenic is."
It was also Dr. Crawford's opinion that "without a doubt," on February 4, 1976, the appellant could not distinguish right from wrong.
During questioning by the court, Dr. Crawford stated that he remembered that the shooting was due to an argument over *Page 509 
money which had been owed to the appellant by his brother. Dr. Crawford acknowledged that at the time he examined the appellant on February 4, 1976, the appellant could not distinguish right from wrong, nor was he capable of forming an intent.
During cross-examination, Dr. Crawford testified that, with the appellant's past history of mental disorders, it would be impossible for him not to have been a "paranoid schizophrenic" on the date of the shooting.
Johnny Pogue had been acquainted with the appellant at the Calhoun County jail. Pogue testified that he had observed the appellant eat off the floor and wash his face in the water in the commode instead of that in the sink. According to Pogue, the appellant had to be given a bath and had to be shaved. Pogue recalled that the appellant had intentionally set his cell on fire. Pogue also testified that, as far as the sanity of the appellant was concerned, he could not distinguish right from wrong.
G.B. Williams was recalled by the defense, and he testified that in his opinion, at the time of the shooting on January 28, 1976, the appellant was not able to distinguish right from wrong. On further questioning, Williams acknowledged that he had not seen the appellant eat off the floor or wash his face in the commode. The witness also acknowledged that on January 28, 1976, he had no knowledge of his brother's having engaged in such behavior.
Deputy M.L. Kirby's testimony was read into the record pursuant to an agreement between the parties. That testimony revealed that Deputy Kirby had observed the appellant in jail since April, 1978, and that, in his opinion, "he is of an unsound mind." Deputy Kirby felt that J.L. Williams "should be in a hospital instead of a jail." Additionally, Kirby did not think that "you could sit down and have a conversation with Mr. Williams at all."
 I
The appellant contends that the trial court erred in denying the appellant's pretrial motion for a sanity examination. He argues that the trial should have been deferred to a later time because the appellant was incompetent to stand trial, and, thus, was not able to intelligently consult with counsel or assist in the preparation of his defense. Counsel feels that the appellant was, therefore, denied his right to a fair trial.
On the date of the trial, November 30, 1978, a hearing was held out of the presence of the jury before the trial judge on the pretrial motion. At that time, the court took under consideration evidence that a petition had been filed on September 26, 1978, seeking a civil commitment of the appellant.
Testimony was taken from the appellant's brother, George Williams, indicating that he had sought the petition for the commitment of the appellant. Williams stated that his brother had spent twenty-four years in mental institutions and that the appellant needed treatment.
Johnny Pogue gave testimony concerning the appellant's bizarre behavior.
Gus Colvin, an attorney in Anniston, Alabama, who was appointed the appellant's guardian, talked to the appellant after he had been indicted. Colvin testified that he was the guardian for approximately fifteen incompetent veterans and that the appellant was in worse shape mentally than all the others. Colvin also indicated that, since the appellant's return from Bryce, he had noticed a deterioration in the appellant's ability to communicate. Colvin stated that he had received a number of telephone calls from the appellant while he was in Bryce.
Colvin stated that "it would be next to impossible" for the appellant to assist in his defense. The witness added that the appellant "doesn't appear to be upset or anything, he's just blank." When asked whether the appellant could aid in his defense, Colvin testified, "I don't know whether he could or couldn't."
Juan Burke, Sheriff's Jailer of Calhoun County, testified that the appellant was "on two or three different types of medicine" when he was returned from Bryce. Burke indicated that all of the medicine had been *Page 510 
used and that no request had been made to refill the prescription. At that time, Burke was admonished by the court that the sheriff had the responsibility of seeing "that any mental patient continues to have his medicine whether he asked for it or not." The judge added, "He has to have medicine to stay sane." In closing, Burke acknowledged that the appellant's condition had gotten worse since he had first known him.
William E. McGriff, the appellant's defense counsel, testified: "I haven't been able to get any help from him or any aid in his defense, and I am convinced that he doesn't understand the charges against him."
At the close of the testimony, the trial judge stated that he perceived the issue in the hearing to be "whether he [the appellant] is able to assist in his defense or not, and I have been aware of Mr. Williams here in the Courtroom." He further stated:
 "His expressions, that is to say, it's not possible. It's apparent that he's cooperative and friendly and interested in the procedure and alert and this is simply from watching Mr. Williams. So what I am going to do is put off this question of sending him down to Bryce Hospital. It's not of immediate importance that the Jury can't try him today. So ordering him down there, he wouldn't go down there for at least a week or possibly two weeks or maybe a month. And I am going to decide that he is capable of assisting in his defense, that he was pronounced capable in April of 1978 by a committee of doctors at the Bryce Hospital, April 14th, 1978. And that in view of Mr. Williams and reading the exhibits and listening to the testimony I feel fairly certain that he will be able to furnish whatever assistance may actually be necessary in this case. So, I'm going to put him on trial at the present time and defer the question of ordering him to Bryce until a later date. . . ."
The question as to whether an investigation should be made concerning the sanity of the accused is a matter addressed to the sound discretion of the trial court. The decision of the trial judge on such a matter is raised on appeal only upon proof of abuse of discretion. Wheeler v. State, 47 Ala. App. 457,256 So.2d 197. See also Richardson v. State, Ala.Cr.App., 354 So.2d 1193;Pierce v. State, 52 Ala. App. 422, 293 So.2d 483.
This court in Atwell v. State, Ala.Cr.App., 354 So.2d 30, addressed the question regarding an accused's competency to stand trial. There, the court said:
 "The competence of an accused to stand trial is determined by whether at the time of the trial he has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and whether he has rational as well as factual understanding of the proceeding against him." (Citations omitted.)
In Atwell, the court stated that, when there are facts before the trial judge which would create a "reasonable and bona fide doubt as to the mental competency of the accused to stand trial, there is no question but that the trial judge must take steps to assure a reasonable legal determination of such questions." The court in that case further stated:
 "Where reasonable cause is shown to believe that the accused may be incompetent to stand trial, the judge, under Alabama law, has two alternatives: (1) He may empanel a jury as provided by Title 15, § 426, Code of Alabama 1940, Recompiled 1958, or (2) he may, within his discretion, refuse to grant relief under § 426 and establish some alternate method of determining the competence of the defendant to stand trial. Seibold [v. Daniels, 337 F. Supp. 210
(D.C.)], supra; Brinks v. Alabama, 465 F.2d 446 (5th Cir. 1972)."
According to Atwell, in determining the existence of circumstances raising a reasonable doubt of the accused's competency, an examination of the facts existing after the appellant's return from Bryce Hospital on April 14, 1978, should have been made. In Atwell, this court recognized that the comments of defense counsel concerning an accused's *Page 511 
competency to stand trial are not conclusive; however, they should be considered by the court along with the other evidence in determining whether the appellant is competent to stand trial.Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103;Goulden v. State, 53 Ala. App. 276, 299 So.2d 321; Moore v. State,52 Ala. App. 179, 290 So.2d 246.
Absent a change in the appellant's mental condition subsequent to a determination of competency by Bryce Hospital authorities, the trial judge has a right to rely upon the certification by the Bryce Hospital authorities. See Atwell, supra.
In the present case, the trial court heard the witnesses and observed the appellant during the pretrial hearing on the motion. The trial judge is in a far better position to determine the appellant's competency to stand trial than is a reviewing court who relies on the record. Richardson v. State, supra. The evidence indicates that there had been a change in the appellant's condition after his return from Bryce Hospital. We have reviewed the testimony that the appellant had eaten off the floor, had washed his face in the commode, and had intentionally set fire to his cell. We are also aware that the appellant's brother had stated that he was not aware of the appellant's bizarre behavior.
From the facts presented in this case, we are convinced that the appellant was not competent to stand trial. See Atwell, supra. Also, we are convinced that the trial court abused its discretion in failing to initiate a second inquiry regarding the competency of the appellant to stand trial. See Atwell, supra;Pate v. Robinson, 383 U.S. 375, 85 S.Ct. 836, 15 L.Ed.2d 815;Pierce v. State, 52 Ala. App. 422, 293 So.2d 483.
Therefore, the judgment and conviction of the Calhoun Circuit Court must be reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.