Abdullah Abdus Sabiar was indicted for the capital offense of robbery/murder, in violation of § 13A-5-40(a)(2) Code of Alabama 1975. The appellant was found "guilty as charged" in the indictment by the jury and was sentenced by the court to life imprisonment without parole in the State penitentiary.
Nathan Madison, the manager of the Ensley Grill, was shot to death during a robbery at the Ensley Grill in Birmingham, Alabama, on April 16, 1986. This appellant was charged with capital murder.
On the night of the robbery/murder, Nathan Madison, the manager, and four others were working at the Ensley Grill. The four employees were Chris Fikes, Calvin Torbert, Jeff Odum, and Jerome Pitts. Three of the employees, Fikes, Odum, and Torbert were emptying the garbage at the rear of the building when they were approached by three armed men. These armed men forced the employees back inside the building and, once inside, the employees were forced to lie on the floor. These three men were armed with one or two handguns, a shotgun, and one of the robbers was carrying a blue and white tote bag.
One of the robbers asked "where the man was," and Jerome Pitts, an employee, took him to the back office where the manager, Nathan Madison, was working. One of the robbers was armed with a shotgun and fired it into the ceiling. Jerome Pitts ran to the point where the other employees were lying on the floor. The employees stated that there was another shot fired and, perhaps, two during this robbery. The armed men then fled from the restaurant. Once the robbers had left, the four employees ran to the back office where they found the manager, Nathan Madison, lying on the floor. Nathan Madison was rushed to the hospital where he later died from a single gunshot which struck the head and neck.
The appellant and other alleged co-defendants later divided the money at the home of Alloysius Gardiner. Brenda Carlisle, the girl friend who was living with Gardiner, was given a sack full of coins by Gardiner. The following morning, Brenda Carlisle took the coins to the home of Gardiner's aunt, Mary Govan. Mrs. Govan discovered the coins and called the police and turned the coins over to them. Mrs. Govan and Brenda Carlisle gave the police the names of Alloysius Gardiner, Tony Hollingsworth, and Gates Brown.
On the same day that Gardiner was arrested, this appellant told Maggie Turner that Brenda Carlisle had reported him to the police. He wanted to know if the police were still around, and she told him that they had gone. He told Mrs. Turner that he had participated in the Ensley Grill robbery and he also said, "Yeah I shot him, *Page 663 
and I'm fixing to get out of town." (R. 253) This appellant said that he shot the manager because he was not cooperating.
On April 18, 1986, this appellant approached Arlesta Harris on Decatur Street in Ensley. This appellant pulled a pistol and told Ms. Harris to drive north on Interstate 65. This appellant told her that he was in a lot of trouble, and that he had already killed a man, and he did not want to have to kill her. In Cullman County Ms. Harris told the appellant that she was running out of gas and needed to re-fuel. When she pulled into a gas station, she escaped, and the appellant fled in her car. This appellant was arrested shortly thereafter when Ms. Harris' car ran out of gas. Officers found him hiding near the car, and a pistol was taken from him at the time of his arrest.
The pistol was tested by firearms experts, and a bullet found in the wall of the Ensley Grill matched that of one test-fired from this pistol.
 I
The appellant argues that the trial court erred in denying his motion for psychiatric examination. Under Ake v. Oklahoma,470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), a State must provide an indigent defendant with access to the assistance of a State provided psychiatrist if the defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial.
In reviewing the record of the trial court, this court finds no error in the trial court's analysis of testimony presented by this appellant. The trial court held that the appellant did not make a significant preliminary showing under Ake v.Oklahoma, supra, and we agree.
The appellant presented the testimony of his mother, Irene Strozier, that, after the defendant left the U.S. Army in 1980, he began acting bizarrely, talking irrationally, becoming upset for no reason, and talking to himself. Donna Click, a social worker at the Jefferson County Jail, testified that she had interviewed the appellant. The appellant told her that he had previous psychiatric treatment in Leavenworth, Kansas while in the army. The records of such treatment are unavailable, and the appellant says they were lost when being transported to another base in 1979. The appellant also told Donna Click that he had been using drugs for the past ten years.
The testimony of Donna Click states that she has worked at the Jefferson County Jail for fifteen and one-half years and she has a BA in Education, an MA in Guidance Counseling, and 30 hours beyond a Masters in more or less what is termed General Psychiatry at the University of Alabama in Birmingham. She is regularly involved in the evaluation process of alleged mental case prisoners, and the following is her testimony as to her observations of this appellant.
 "He was very cooperative. There was nothing bizarre about him, such as hallucinations or delusions. I didn't pick up anything just outwardly, and he showed, you know, no psychiatric behavior I'll say in the classic sense of working with someone that is a psychotic. He did not show any type of psychosis." (R. 181-182).
Mrs. Click went on to say, "At the time I talked to him I did not feel he was psychotic, or had any psychiatric symptoms, and that he did not display any psychiatric behavior." (R. 182).
This court held in Holmes v. State, 497 So.2d 1149
(Ala.Cr.App. 1986), that an accused must make a preliminaryshowing that his sanity at the time of the offense is questionable before he is entitled to psychiatric assistance on this issue, if he is unable otherwise to afford access to a psychiatrist.
The appellant's behavior at the time of this crime is at issue, and not his behavior earlier in 1980. There are no records of any prior psychiatric treatment and we do not think that the allegations of prior treatment were entitled to be given much consideration by the trial judge in making his decision. The testimony of Donna Click, a person with fifteen and one-half years of experience of evaluating alleged mental *Page 664 
case prisoners, did not indicate any evidence of psychotic behavior. Furthermore, the trial judge stated:
 "The reason I declined to appoint a psychologist to examine the defendant is that in the court's judgment there is not a significant — that the mental disease or defect of this defendant is not a significant factor in the defense of this case, therefore I did not find it incumbent upon me to pursue it. Not because he was not indigent or retained or whatever, that had nothing whatsoever to do with it. Also he even prepared a motion which you had typed up and presented to me. This man has shown himself very active in his defense. And he sure isn't suffering at the moment anyway from any mental disease or defect. He handles himself very well in the whole thing, and we've gone days in suppression. Anyway that is why I denied the appointment of the psychiatrist because I don't think it's a significant factor in the case." (R. 357-358.)
The question of whether vel non a reasonable doubt as to competency exists is within the trial court's discretion.Livingston v. State, 419 So.2d 270 (Ala.Cr.App. 1982), Williamsv. State, 386 So.2d 506 (Ala.Cr.App. 1980). The fact that the appellant was active in his defense, coupled with the testimony of Donna Click and Irene Strozier, gave the trial judge a proper foundation for rendering his judgment as to this appellant's competency. It should be further noted that this court gives great deference to the trial court in its determination. Holmes v. State, supra.
A review of the trial court record shows that the appellant failed to make a preliminary showing that his sanity at the time of this offense was likely to be a significant factor during the time of the robbery or the trial of this cause. Therefore, the trial court was not in error in denying this appellant's motion for a court-appointed psychiatrist.
 II
The appellant argues that the trial court erred in refusing to allow this appellant to ask co-defendant Alloysius Gardiner if Tony Hollingsworth had shot the victim. (R. 1337.)
The defense called Gardiner to the stand. Gardiner is a co-defendant who had not been brought to trial as of the date of this appellant's trial. The following is the record from the examination by the trial court out of the presence of the jury on this matter. (R. 1333-1338). This was an in-camera hearing held without the jury being present.
"EXAMINATION BY THE COURT:
 "Q. Do you know you are subpoenaed as a witness by the defendant?
"A. Yes, sir.
"Q. And Mr. Gomany is your lawyer?
"A. Yes, sir.
 "Q. Has he talked to you and you talked to him about the perils of testifying, that it can be used against you at a later date?
"A. Oh, well, I know that myself.
"Q. And your lawyer has told you that?
"A. Yes, sir.
 "Q. And I'm asking you now do you choose to take the 5th and not testify?
"A. Yes, sir.
 "THE COURT: What I'm going to do is call the witness in here. I'll say this is Alloysius Gardiner, who has been subpoenaed here by the defendant. This is his lawyer. And all you can ask him is his name and address. Mr. Wynn, when you call him, I'll put him on as a witness, and you ask him his name and address, at which time he will say or his lawyer will say he takes the 5th Amendment on the grounds it may incriminate me. And I'll explain to the jury at length and fully that it is his perfect right and he has the right to have his lawyer here. Okay?
"MR. WYNN: Yes, sir.
 "THE COURT: I know you won't do this, Mr. Wynn, but don't make any proffer of testimony like we make a proffer of evidence to show whatever you want to show.
 "MR. WYNN: Judge, I want to be perfectly up front, but other than his *Page 665 
name and address, I would like to ask him two or three other questions about this incident.
 "THE COURT: No. Absolutely not. One, if he goes past the name and address and starts answering anything, about this incident —
"MR. WYNN: I don't say he has to answer.
 "MR. ANDREWS: I object to him asking are you the trigger man in the Ensley Grill.
 "THE COURT: When his lawyer steps forward and says — once he says he takes the 5th Amendment, no. Because if he goes forward and answers one, two, three, four questions —
 "MR. GOMANY: Would you allow him to ask one question after his name and address?
 "MR. WYNN: I'm not going to ask him the ultimate question, but I don't think —
 "THE WITNESS: Unless the Judge makes me answer I'm not going to tell him.
 "THE COURT: I have instructed him if he takes the 5th not to answer one single thing and not to be asked one single thing, and that is why we're holding this gathering here. Now, you step forward, Mr. Gomany, and tell them or you can tell them.
 "MR. WYNN: This is before I ask him the question?
 "THE COURT: If he wants to stop at that point, he has the perfect right. If they step forward and say, no, this man takes the 5th, he doesn't have to say one solitary word, you know that anyway.
"MR. WYNN: Yes, sir.
"THE COURT: Let him just stand there a second.
 "MR. WYNN: Judge, we would move at this time for a judgment of acquittal on the grounds that the State has not proved the elements of the robbery, which is the necessary elements within the charge of capital murder.
"THE COURT: I overrule it.
"MR. ANDREWS: I'll offer that.
 "THE COURT: Mark in 85 and 86, which is Hollingsworth's photographs.
 "MR. WYNN: That's what I would strenuously object to.
"THE COURT: All right. That's in.
"MR. ANDREWS: I offer State's Exhibit 53.
"THE COURT: Mark it in.
 "(State's Exhibit 53 was received in evidence.)
 "MR. ANDREWS: And I would object to him asking one question.
 "THE COURT: If I find out the question is incriminating, bears some connotation, I'm going to let him go.
 "MR. WYNN: Here's the question: Was it Tony Hollingsworth that shot the manager of the Ensley Grill?
 "THE COURT: One question, no wonder. This is what you call an optimist. That is the most incriminating thing you can ask.
 "MR. WYNN: Well, this man would not answer the question, he would take the 5th.
 "THE COURT: I say no. Because I'm not going to let you ask it. Remember I've got Hollingsworth set the 12th of January, and if I let that question come in —
 "MR. WYNN: Well, Judge, you understand my duty to have to try. Well, can I ask this question: Were you — Well, if that's the case we'll go ahead with Gardiner and I won't get any questions in.
"THE COURT: Bring the jury in.
"(Jury present.)
 "THE COURT: Ladies and gentlemen, the State has rested. In other words, they have rested, that's all the testimony, at least so far they are putting on for the moment. And this is the first witness called by the defendant.
 "And, incidentally, I forgot to say this is the lawyer for this witness (indicating)."
Alloysius Gardiner, the alleged co-defendant took the stand, and the following is the record of his testimony and the judge's *Page 666 
order regarding such testimony. (R. 1338-1340).
ALLOYSIUS GARDINER
 having been previously sworn, testified further as follows:
DIRECT EXAMINATION
"BY MR. WYNN:
 "Q. Would you state your name? "A. Alloysius Orlan Gardiner.
"Q. And what is your address?
"A. 515 Crestwood Boulevard, Birmingham, Alabama.
 "MR. GOMANY: We wish to invoke the 5th Amendment on the grounds it may incriminate him.
 "A. I plead the 5th Amendment. I refuse to answer any questions because it might be used against me.
 "THE COURT: This man is entirely within his rights to do this. In the United States no one can be made to testify. If a man comes up and says what he might be called upon to testify to might lead to incriminate him, he's absolutely right not to testify. And I'm the one to judge whether he might be in that position, and I certainly do think he might incriminate himself.
 "You may go. And you all can go back in the Jury Room for another ten minutes. Thank you."
It is generally understood to be the rule that a potential witness, other than the defendant himself, cannot invoke the U.S. Fifth Amendment not to testify, before taking the witness stand, thus claiming his privilege before such question is asked. A witness may only invoke his Fifth Amendment privilege against self-incrimination after he has been sworn and asked a question which would elicit incriminating evidence if answered by such witness. See C. Gamble, McElroy's Alabama Evidence, § 373.02 (3d ed. 1977) revised 1987 (p. 755.)
 "The rationale for requiring a witness to submit to the questioning and to assert the privilege if he desires to invoke it is that the nature of the privilege so requires. Since the privilege is applicable only if the specific response would come within the scope of the protection and the witness is not the ultimate arbiter of whether this is the situation, a decision on the propriety of invoking it cannot be made unless the question has been put and the witness has asserted his basis for refusal to answer. Of course, this procedure endangers to some extent the values which the privilege is designed to protect. Subjecting a witness to a series of questions to which he must respond by invoking the privilege is somewhat akin to the interrogation which the privilege is historically sought to protect against. Requiring that the witness make a question- by-question judgment on the legal necessity of responding creates a danger that the privilege will not be invoked because of confusion or exhaustion rather than the knowing and intentional decision not to invoke it requiring for a waiver of a constitutional right. Against these dangers, however, must be weighed the public interest in obtaining as much information as possible without directly infringing on the witness's protected rights. Moreover, where the purpose of the inquiry is not the taking of action against the subject of the inquiry, the danger of improper use of the inquiry is reduced. On balance, therefore, the policy factors support the imposition of a more stringent and complex procedure upon one not an accused who wishes to invoke the privilege." McCormick, Evidence, § 136 (2nd Ed. 1977). (p. 289).
Although it may be error in some instances for the trial judge not to allow the defense to ask the question before the witness invokes his Fifth Amendment privilege, it is not error in this cause, inasmuch as the trial judge knew what the question was beforehand and determined that it would be incriminating to the potential witness, Gardiner. The rationale for the rule that the question must be first asked and then the U.S. Fifth Amendment right invoked supports this conclusion. *Page 667 
In Ex parte Reeves, 463 So.2d 177 (Ala. 1984), the Alabama Supreme Court held that a witness must be required to take the stand in the presence of the jury and invoke his privilege in response to any question by the defendant which would have elicited incriminating evidence if answered. In order to predicate error on the trial court's refusal to compel a witness to testify, an offer of proof must be made to show that the expected testimony of the potential witness would not be incriminating. Here the question submitted to the trial judge by the defendant's attorney was "Was it Tony Hollingsworth that shot the manager at the Ensley Grill?" Any response given by the witness would be definitely incriminating since it would place him at the scene of the robbery/murder, thus the potential witness, Gardiner should not have been required to answer this question. (Authorities herein cited).
 III
The appellant argues that the trial court erred in not suppressing the appellant's statements.
The appellant made statements to the police on two occasions and on April 19, 1986, this appellant denied any knowledge of the robbery/murder at the Ensley Grill. This statement was given after the appellant was given his "Miranda rights." In the second statement the appellant admitted that he was involved in the Ensley Grill robbery but stated that "he was not the triggerman."
The appellant alleges that no intelligent waiver of his rights was shown, thus the statement should not have been allowed into evidence.
Captain Knight, the officer that took the second statement, testified that the appellant was given a specificMiranda warning before he made the confession on April 22, 1986. The officer further testified that he did not have a "rights waiver" form, so none was signed prior to this confession. The officer did, however, testify to the following, showing that the appellant did know his rights and made an intelligent waiver of these rights.
 "Q. All right. What indication, if any, did he give you that he understood these rights?
 "A. I asked him did he understand each of the rights and having his rights in mind did he wish to talk to us.
"Q. Okay. And what indication did he give to you?
 "A. He said that he did understand them and that he would talk to us.
 "Q. And I'm going to show you State's Exhibit 2, this Birmingham Police Rights Waiver Form did you have one of these at that time?
"A. No, sir.
 "Q. Okay. But did he indicate to you that he understood his rights and wished to make a statement to you?
"A. Yes, sir."
It has already been decided in Inzer v. State, 447 So.2d 838
(Ala.Cr.App. 1983), cert. denied, 447 So.2d 850 (Ala. 1984), that the failure of the defendant to sign a written waiver form does not invalidate an otherwise valid waiver. The record shows that the appellant knew of his rights and that he did make a valid waiver of these rights, thus the trial court did not err in refusing to suppress the confession of April 22, 1986. Where the record establishes the defendant was given his Miranda
warning and also proper voluntariness predicate was established, as here (R. 84-92), and the defendant waived his or her rights and answered the officers' questions, a finding that the statements are voluntary is proper by the trial judge.Fenn v. State, 456 So.2d 1165 (Ala.Cr.App. 1984).
The Court of Criminal Appeals will not overturn a trial court's finding as to the voluntariness of a statement unless the decision is wrong and against the great weight of such evidence. Chambers v. State, 455 So.2d 1008 (Ala.Cr.App. 1984).
 IV
The appellant argues that the court erred in admitting the alleged murder weapon into evidence because no proper chain of custody was established. *Page 668 
To establish a sufficient predicate for the admission of evidence it must be shown that there is no break in the chain of custody, of same. Miller v. State, 484 So.2d 1203
(Ala.Cr.App. 1986).
The appellant claims there is a missing link in the chain of custody in two separate respects. The first of which it is argued is created by the "irreconcilable conflict of testimony" of Sergeant Walker and that of Captain Knight regarding the handling of the gun.
Sergeant Walker testified that he received the pistol, which the appellant had in his possession at the time of his arrest, on that same date. He testified that he locked the pistol in his desk and he had the only key. Thus no one could remove it until he delivered it to Officer Quinn. He later corrected this testimony by testifying that Captain Knight, his supervisor, also had access to the key to his desk.
Captain Knight testified that he removed the pistol from the desk of Sergeant Walker at the request of District Attorney David Barber. The District Attorney was in the process of interviewing Tony Hollingsworth, an alleged co-defendant, at that time. The gun was handed to the District Attorney and later returned to Captain Knight by the District Attorney. District Attorney Barber testified that he only had the gun for twenty minutes and that he did not change or alter the gun in any way.
When reviewing the record as a whole, there is no conflict in such testimony. Sergeant Walker testified that his supervisor, Captain Knight, had access to his desk, and to his knowledge no one removed the pistol from his desk. Captain Knight testified that he removed the gun for about twenty minutes without Sergeant Walker's knowledge, thus there is no significant contradiction in testimony. Trahan v. State, 450 So.2d 1102
(Ala.Cr.App. 1984). Furthermore, this court held in Grice v.State, 481 So.2d 449 (Ala.Cr.App. 1985), that testimony of police officers who obtained and handled the evidence was sufficient to satisfy proper chain of custody. In this cause the gun with the same serial number and same make and caliber as the one found on this appellant at the time of his arrest was entered into evidence, thus this appellant's claim has no merit.
The appellant's second claim of a break in the chain of custody also has no merit. This appellant's second claim is based on the change of custody of this pistol from Officer Quinn to David Higgins of the Department of Forensic Sciences. Officer Quinn received the pistol from Sergeant Walker and was told to take it to David Higgins. The defendant claims that a Department of Forensic Sciences report indicates that the gun was received by that department on April 18, 1986. The appellant contends that, if this is true, then Captain Knight could not have removed the pistol from the desk of Sergeant Walker on April 19, 1986. The forensic sciences report is not in the record, but is only referred to in a motion, thus this issue is not properly reviewable by this court. Jackson v.State, 260 Ala. 641, 71 So.2d 825 (1954). We regard this as an immaterial or insignificant matter.
We have carefully reviewed this record. We find no error and the judgment is affirmed.
AFFIRMED.
All the Judges concur.