The appellant, David Stewart, was convicted of murder, in violation of § 13A-6-2, Code of Alabama 1975. He was sentenced to life in the state penitentiary.
This case involves the murder of Debbie Stewart by her husband, David Stewart. Debbie and David began their courtship in 1975 and lived together for three years in Decatur, Alabama, before marrying in August 1978. Debbie was a widow and had a five-month-old daughter when she met David. During the time Debbie lived with David, she became pregnant; however, that pregnancy was terminated by abortion.
Soon after Debbie and David were married, they purchased a house in Southeast Decatur. Debbie had quit her job as a nurse, so the family lived on David's income. David was a psychologist coordinator for a training group at the Wallace Center.
In 1979, the couple had a second child. Around this time, they also began extensive renovation on their home. The remodeling became exceedingly expensive, causing financial difficulty. This seemed to be *Page 1367 
the beginning of David and Debbie's marital discord.
In February 1984, a third child was born. To better accommodate the children, David and Debbie decided to add a second story to their house, even though they could not afford it. Also, Debbie began to experience emotional problems stemming from the difficult pregnancy and delivery of her last child. The marriage further deteriorated.
July 10, 1984, began just as any other day did for Debbie and David. David left early for work and Debbie and her children visited back and forth all day with her neighbor, Evelyn Grace, and her children. At approximately 6:00 p.m., Evelyn took Debbie's two oldest children to a ball game, leaving Debbie at home with her infant daughter.
Shortly thereafter, David returned home from work to find Debbie sitting in the dark on the sofa in the den. When David asked her what was wrong, she told him that a representative from the utility company had come to their home with a returned check, and that he had come to turn the electricity off. Two of Debbie's neighbors had been there and this had been very embarrassing to Debbie.
An argument ensued. Debbie accused David of being weak for not demanding a larger salary at work. Then, Debbie told David that she was going to leave him. She packed an athletic bag and did, in fact, leave.
Meanwhile, Evelyn returned with the Stewart children at 9:00 p.m. She walked them across the alley to their backyard. David was sitting outside waiting on them. He told his children to stay outside with him for a little while because the baby had been fussing and Debbie was trying to rock her to sleep.
David and the children went to sleep. Around 10:00 p.m., David was awakened by the return of Debbie. She told him that she had decided to take the girls and go live in Texas with her sister. At this, David picked up the book he had been reading earlier and hit Debbie in the head. He then picked up a jump rope that was lying on the floor and strangled her to death.
Because blood was coming out of Debbie's mouth and nose, David moved her body to the shower in the bathroom adjacent to his bedroom. He then addressed the problem of disposing of her body. He later stated that he did not want to go to jail and have his children taken away from him. He said that he knew he could not dispose of a whole body. He used utility razor blades to cut through Debbie's flesh and used a hacksaw to cut her bones. When he was finished, Debbie's body had been dismembered into eight pieces.
David next wrapped each body piece in newspaper and placed each in a plastic bag. He took the bags to an unfinished bathroom upstairs and locked the bathroom door. Then, he checked on the children and went to bed.
The next morning, David took the children to his aunt's house and began considering how to dispose of Debbie's body. After taking three weeks to explore many alternatives, he decided to build a fish pond in his back yard and bury Debbie underneath the fish pond. With the help of Virgil Key, he began construction of the pond. However, when the time came to pour the cement into the pond, he dismissed Virgil from the job. Just before daybreak and for some time thereafter, David moved Debbie's body into the hole, covered it with cement, and finished the pond. From that time on, David continually landscaped the area immediately around the fish pond to keep it pretty.
Also, on the morning after Debbie's brutal murder, David began his attempt to cover up the crime he had committed. He told neighbors and family members that Debbie was suffering from severe post-partum depression and had packed a small suitcase and just vanished into the darkness. David, assisted by Debbie's family, immediately began a search that was to last three years.
David went to great lengths to stage Debbie's flight. He petitioned the probate court, requesting that Debbie be committed *Page 1368 
to the Department of Mental Health, if found, alleging that she had a mental problem and was a threat to herself. He persuaded Odell Crudden, a resident of New Orleans, Louisiana, to call him collect from various pay phones around the French Quarter so that when his phone bills came in, he could show them to Debbie's family and the police and tell them that Debbie had called. This farce resulted in an intense search for Debbie in the French Quarter by Debbie's brother and the New Orleans police, "assisted" by David. Posters and fliers were made and were distributed all over the city.
In the meantime, David's life had returned to normal. Approximately six months after Debbie's death, David began a relationship with his fifteen-year-old baby sitter. Six months after the relationship began, the two were sexually involved.
David's financial problems worsened the point of bankruptcy. When his house was taken away from him, the police got permission from the new owner to dig up the fish pond. It had been rumored among the neighbors for three years that Debbie was dead and was buried under the pond. On August 19, 1987, an excavation yielded the somewhat preserved body of Debbie Stewart, which was later positively identified through dental records. David Stewart was arrested that afternoon.
The appellant raises three issues on appeal.
 I
The appellant first contends that the trial court erred in denying his motion for a psychiatric evaluation. Specifically, the appellant argues that because he was indigent, he was entitled to a psychiatric evaluation to assist in the presentation of his defense. He relies on Ake v. Oklahoma,470 U.S. 68, 83, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985), for the proposition "that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the appellant access to a competent psychiatrist who will conduct an appropriate examination and assist in [the] evaluation, preparation, and presentation of the defense." Id.
A criminal defendant does not have a right to a mental examination merely because he requests one. Blevins v. State,516 So.2d 914, 915 (Ala.Cr.App. 1987); Marlow v. State,538 So.2d 804, 807 (Ala.Cr.App. 1988). Nor does the fact that an accused is indigent automatically entitle him to a free psychiatric evaluation. Nelson v. State, 405 So.2d 392, 394
(Ala.Cr.App. 1980), reversed on other grounds, 405 So.2d 401
(Ala. 1980); Bailey v. State, 421 So.2d 1364, 1367
(Ala.Cr.App. 1982). An indigent defendant will be entitled to state-funded psychiatric assistance only after he has made a preliminary showing that his sanity at the time of the offense is questionable. Holmes v. State, 497 So.2d 1149, 1151
(Ala.Cr.App. 1986); Sabiar v. State, 526 So.2d 661, 663
(Ala.Cr.App. 1998).
After carefully reviewing the record, this court finds no error in the trial court's analysis of the evidence presented by the appellant. A defendant bears the burden of persuading the court that a doubt exists as to his or her competency.Miles v. State, 408 So.2d 158, 163 (Ala.Cr.App. 1981), cert.denied, 408 So.2d 163 (Ala. 1982); Robinson v. State,428 So.2d 167, 171 (Ala.Cr.App. 1982). The trial court held that the appellant did not make a significant preliminary showing of insanity at the time of the offense, and we agree.
The appellant presented absolutely no testimony that he was suffering from a mental disease or defect at the time of commission of the crime that would support his not-guilty-by-reason-of-insanity defense. The only testimony the appellant put on in support of his motion for a psychiatric evaluation was that of two local attorneys. Clint Brown testified that it had been his experience as a practicing attorney that an examination from Taylor Hardin Secure Medical Facility was thorough and furnished the court with a detailed report of a person's psychiatric history. Richard Adams, who had previously been involved in the appellant's case, testified *Page 1369 
that he did not think the appellant was crazy or insane but that he did need a psychiatric examination.
The appellant failed to meet his burden and the trial court's ruling was correct, based on the evidence before the court. Moreover, the trial court is in a far better position to determine a defendant's competency to stand trial than is a reviewing court, which relies only on the record. Anderson v.State, 510 So.2d 578, 580 (Ala.Cr.App. 1987). Therefore, "the decision of the trial judge on such a matter is raised on appeal only upon proof of abuse of discretion." Livingston v.State, 419 So.2d 270, 274 (Ala.Cr.App. 1982), citing, Williamsv. State, 386 So.2d 506, 510 (Ala.Cr.App. 1980).
 II
Second, the appellant contends that the trial court incorrectly overruled his motion for a change of venue. He supports this contention by arguing that this case presented an unusual situation that had attracted widespread publicity, interest, and emotions. Factors contributing to this situation were the unusually gruesome and bizarre facts surrounding the case, the fact that the community in which the incident occurred is relatively small, the fact that many people in the community knew the victim or a member of the victim's family, and the fact that the incident was widely covered by the news media, including the Associated Press and the NationalEnquirer.
In Ex parte Magwood, 426 So.2d 929 (Ala. 1983), cert. denied,462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983), the Alabama Supreme Court examined the standard of review used when reviewing a trial court's ruling on a motion for a change of venue and the defendant's burden of proof to show he was actually prejudiced. The Court held:
 "Absent a showing of abuse of discretion, the ruling of the trial court on a motion for change of venue will not be disturbed. Speigner v. State, 367 So.2d 590 (Ala.Cr.App. 1978), cert. denied, 367 So.2d 597 (Ala. 1979). The defendant has the burden of showing that he will be unable to receive an impartial trial and an unbiased verdict at the present locale. Speigner, supra.
 "Absent a showing of actual prejudicial influence upon the jury, the trial court was not in error in refusing to grant a motion for change of venue. Dolvin v. State, 391 So.2d 666
(Ala.Cr.App. 1979), aff'd, 391 So.2d 677
(Ala. 1980)."
Magwood, 426 So.2d at 931.
In Anderson v. State, 362 So.2d 1296 (Ala.Crim.App. 1978), Judge Bowen wrote:
 "[T]he existence of widespread publicity alone does not indicate that a defendant will not get a fair trial. The law focuses on the impartiality of the trial jury. Turk v. State, 348 So.2d 878
(Ala.Cr.App. 1977); Mathis v. State, 52 Ala. App. 668, 296 So.2d 755, cert. quashed, 292 Ala. 732, 296 So.2d 764 (1973), cert. denied, 419 U.S. 1106, 95 S.Ct. 777, 42 L.Ed.2d 802 (1975). Actual prejudice directed toward the accused resulting from the extensive publicity must be shown. Botsford v. State, 54 Ala. App. 482, 309 So.2d 835
(1974), cert. denied, 293 Ala. 745, 309 So.2d 844
(1975); Annotation, 33 A.L.R.3d 17 (1970).
 "Except in the situation where there is a showing of 'inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors', the trial court's primary responsibility in dealing with allegedly prejudicial pretrial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); United States v. Jones, 542 F.2d 186 (4th Cir. 1976); McWilliams v. United States, 394 F.2d 41 (8th Cir. 1968)."
Anderson, 362 So.2d at 1298-99.
The correct way to determine whether adverse publicity may have biased prospective jurors is through the voir dire *Page 1370 
examination. Anderson v. State, 443 So.2d 1364, 1368
(Ala.Cr.App. 1983). In Murphy v. Florida, 421 U.S. 794, 799,95 S.Ct. 2031, 2035-36, 44 L.Ed.2d 589 (1975), the United States Supreme court noted that "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved." The Supreme Court further explained, in Irvin v. Dowd, 366 U.S. 717,81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):
 "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."
Irvin, 366 U.S. at 722-23, 81 S.Ct. at 1642-43 (citations omitted).
On voir dire examination, the trial court examined prospective jurors as to what they had read or heard about the case and as to whether what they had read or heard would influence their verdict. The record indicates that no prospective juror who indicated that he or she could not render a fair and impartial verdict served on the jury. There is nothing in the record which would suggest that the jury did not follow its sworn duty to base its verdict upon the evidence presented and the law as explained by the court's instruction. Therefore, we find no error in the trial judge's refusal to grant the motion for a change of venue.
 III
Finally, the appellant contends that the trial court erred in admitting into evidence two statements made by him while he was in the custody of the police. Specifically, he challenges the voluntariness of these statements, alleging that: (1) the police officers continued their interrogation after he had expressed a desire, or asserted his Miranda right, to remain silent; and (2) the police officers used coercion in obtaining the statements.
At trial, the following exchange occurred during the cross-examination of Jep H. Tallent, the police officer who took the appellant's statement:
 "Q. (By Mr. Roby) Okay. You have told him initially as I understand your testimony that — at the Wallace Center, that you wanted to talk to him again about Debbie's disappearance.
"A. Yes.
 "Q. Or about Debbie leaving. What did you tell him?
 "A. I think I said Debbie's disappearance or Debbie's — I could have said Debbie's leaving, I just don't recall.
 "Q. So he comes to the police station, you read him his rights, he signs a paper and begins to tell you the same story.
"A. Yes.
 "Q. You stopped him midway through it and you tell him then where you had been that day and what you had seen.
"A. Yes.
 "Q. Now, you testified that at that point his breathing became labored or changed — maybe it didn't become labored, but you said his —
 "A. You could tell that it shook David a little bit. He didn't show any emotional breakdown or anything like that —
 "Q. And you asked him at that time did he want to talk to you.
"A. Yes.
"Q. And he said, 'No.'
"A. Yes. That's what he said.
 "Q. Now when he said, 'No', did you take that to mean that no, he did not want to talk to you any further?
 "A. No, I did not take that that he did not want to talk to me any further.
"Q. What did you think the 'No' meant?
 "A. What I asked him was, 'David, do you have anything to tell me?' at that *Page 1371 
time, and he said, 'No.' And that's when I continued on, and then when I told him we had gotten Debbie out from under the fish pond, he said, 'I guess I better talk to you.'
 "Q. Did you tell him that you had videotaped that excavation?
"A. No, I did not.
 "Q. Did you tell him that — was there no discussion to the best of your recollection about the video tape?
"A. Not that I recall, no.
 "Q. Did you ever tell David that you were going to burn him if he didn't talk to you?
"A. How do you mean burn?
 "Q. Well, did you use that expression? 'David, if you don't talk to us we are going to burn you.'
 "A. No, I didn't say that, 'If you don't talk to us we are going to burn you.' I may have told him that it was a possibility or a probability that he was going to the chair.
 "Q. Well, had he been charged with anything at that time?
"A. No.
 "Q. Are you aware that this is not a capital case?
"A. At that time I was not aware of it, no.
 "Q. And were you aware that the range of punishment in this case is something less than the death penalty?
 "A. Later, when we determined the criteria of the case. At that time until we talked with David, we did not know it was not a capital case.
 "Q. Jay, do you recall ever saying or telling David that unless he talked to you were going to fry him? Do you remember using the word 'fry'?
 "A. I may have told him that we were going to send him to the chair or I may have told him that he may burn, but I didn't tell him that to get him to give me a confession, no.
 "Q. Well, how else would he take it? You did it in the context of obtaining this statement, did you not?
 "A. No. David was not at that time withholding anything from Johnny or I, either one.
 "Q. Well, what would have been the reason for telling him he was going to burn, fry, go to the chair or whatever?
 "A. It could have been an interview technique. It could have been letting him know how serious a position he was in.
 "Q. And subsequent to that, he gave you this statement that's been offered as State's Exhibit — the one on the 19th —
 "A. No. He gave me an oral statement, at which time then it was reduced to writing and he signed it."
Before an accused's confession can be received into evidence against him, both voluntariness and a Miranda[1] predicate must be shown. Whitlow v. State, 509 So.2d 252, 254 (Ala.Cr.App. 1987);Malone v. State, 452 So.2d 1386, 1389 (Ala.Cr.App. 1984). The appellant does not dispute the fact that he was informed of hisMiranda rights. Moreover, Officer Tallent testified that the appellant's Miranda rights were explained to him.
The appellant does, however, contend that the police failed to comply with the mandates of Miranda in that, he says, they continued to question him after he had invoked his Miranda
right to remain silent. Our review of the record convinces us otherwise. It is apparent from the above-excerpted portion of Officer Tallent's testimony that the appellant was not invoking his right to remain silent as guaranteed by Miranda and the Fifth Amendment when he answered "No" to Officer Tallent's question, "Do you have anything to tell me?" This exchange suggests that appellant was simply denying any involvement in his wife's murder rather than invoking a constitutional right, a situation analogous to that in Bush v. State, 523 So.2d 538
(Ala.Cr.App. 1988). In Bush, Judge Patterson, writing for the court, stated as follows:
 "In Miranda v. Arizona, the Court held that, unless law enforcement officers *Page 1372 
give certain specified warnings prior to questioning a person in custody and follow certain specified procedures during the course of any subsequent interrogation, the state may not use in its case-in-chief any statement by the suspect, over the suspect's objection. 384 U.S. at 476-79, 86 S.Ct. at 1629-1630; Christopher v. Florida, 824 F.2d 836, 839 (11th Cir. 1987). Among the procedural safeguards established by the Miranda Court is the 'right to cut off questioning.' 384 U.S. at 474, 86 S.Ct. at 1627. If the suspect indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. Id. at 473-74, 86 S.Ct. at 1627; Martin v. Wainwright [770 F.2d 918 (11th Cir. 1985)]. When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of 'clarifying the equivocal request.' Martin v. Wainwright, 770 F.2d at 924 (quoting Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir. 1979)). The admissibility of a statement obtained after the person in custody has decided to remain silent depends, under Miranda, whether his right to cut off questioning was scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Once informed of Miranda rights, an accused has the burden of indicating in some manner his wish to remain silent. Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir. 1987); United States v. Alegria, 721 F.2d 758 (11th Cir. 1983).
 "We admit, at first glance at the quoted testimony, that it would appear that the right had been asserted. . . . We find [however] that the record supports the conclusion that appellant never invoked or asserted his right to remain silent after being given Miranda warnings, but rather indicates that, although appellant was willing to talk, he steadfastly denied any knowledge of or participation in the crimes until he finally decided to make a statement."
523 So.2d at 553.
We find that, just as in Bush, the record in the instant case supports the conclusion that appellant's response was not an invocation of his constitutional right to remain silent. Thus, no error occurred in this regard.
The appellant next questions the voluntariness of the statements he gave while in police custody.
 " 'A confession is presumed to be involuntary. Before its admission into evidence there must be evidence addressed to the trial judge sufficient to rebut that presumption and a showing that the confession was made without influence of either hope or of fear, unless the attending circumstances affirmatively disclose the voluntariness of the confession.' Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968)."
Mitchell v. State, 508 So.2d 1196, 1198 (Ala.Cr.App. 1986).
The appellant contends that Officer Tallent's comments, while apprising him of the reality of his situation, were coercive and overcame his free will. At trial, Officer Tallent testified that he did not tell the appellant that he would burn, fry, or go to the electric chair in order to obtain a statement from him. He further testified that he did not "recall" whether or not he made such a statement to the appellant. He did, however, state that he was "positive" that such a remark, if made, was not made in order to threaten, coerce, or otherwise overcome the appellant's free will. In response to the questions, "When was the talk about the possible punishment in the case, and whose idea? Who brought it up? " Officer Tallent responded, "That was David. He asked what he could expect. . . . This was after he gave the statement."
"The question of whether a confession is voluntarily made turns on the totality of the circumstances in each particular case." Moore v. State, 415 So.2d 1210, 1211 (Ala. Cr. App),cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610
(1982). The general rule, however, is that "[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. Such an account may increase *Page 1373 
the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent apprisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made." United States v. Ballard, 586 F.2d 1060,1063 (5th Cir. 1978). Although each case must be judged on its own particular merits, this court has previously upheld the admission of confessions given under somewhat similar circumstances. See Thomas v. State, 531 So.2d 45
(Ala.Cr.App. 1988); Ball v. State, 489 So.2d 675
(Ala.Cr.App. 1986).
In the instant case, Officer Tallent's assessment of the accused's situation was both inaccurate and misleading, since Stewart's killing of his wife constituted only murder, not capital murder. Despite this, we find Officer Tallent's advice to the appellant not to constitute reversible error because there is evidence that the officer's statement, if made, was made after Stewart gave his statement. See Ball v. State, 489 So.2d at 677. Therefore, the trial court correctly determined Stewart's confessions to be voluntary. The voluntariness of an alleged confession is a question for the trial court, and a trial judge's decision as to the voluntariness of a statement will not be disturbed on appeal unless the decision is contrary to the great weight of the evidence and is manifestly wrong.Whitlow v. State, supra, 509 So.2d at 255; Tice v. State,386 So.2d 1180, 1185 (Ala. Cr. App), cert. denied, 386 So.2d 1187
(Ala. 1980); Hurst v. State, 356 So.2d 1224, 1234
(Ala.Cr.App. 1978). Therefore, since the statements were given voluntarily and a Miranda predicate was shown, the statements were correctly received into evidence.
Appellant received a fair trial. Accordingly, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).