Rel: August 22, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2022-1383

_____

**Jovon Dwayne Gaston**

**v.**

**State of Alabama**

**Appeal from Calhoun Circuit Court**
**(CC-11-493.80)**

MINOR, Judge.

A jury convicted Jovon Dwayne Gaston of two counts of capital murder in 2015, and the Calhoun Circuit Court, following the jury's 10 to 2 recommendation, sentenced Gaston to death. This Court affirmed Gaston's convictions in 2018 but reversed his death sentence and

remanded the case for a new penalty proceeding. Gaston v. State, 265 So. 3d 387 (Ala. Crim. App. 2018). That proceeding, held in October 2022, resulted in an 11-to-1 jury recommendation for a death sentence.[1] The

-----

[1]This Court noted in Yeiter v. State, [Ms. CR-18-0599, June 28, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024) (opinion on remand from the Alabama Supreme Court):

> "'Act No. 2017-131, Ala. Acts 2017, amended §§ 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, eliminated judicial override, and placed the final sentencing decision in the hands of the jury. That Act, however, did not apply retroactively to Yeiter, who was charged with capital murder before April 11, 2017—the effective date of the Act. See § 2, Act No. 2017-131, Ala. Acts 2017 ("This act shall apply to any defendant who is charged with capital murder after the effective date of this act and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act."). Under the versions of §§ 13A-5-45, 13A-5-46, and 13A-5-47 applicable to Yeiter, the judge, not the jury, had the final sentencing decision.'
>
> "Yeiter [v. State, [Ms. CR-15-0699, Dec. 17, 2021]] ___ So. 3d [___,] ___ n.2 [(Ala. Crim. App. 2021), rev'd on other grounds, [Ms. SC-2022-0417, Sept. 2, 2022] ___ So. 3d ___ (Ala. 2022)].
>
> "This Court has repeatedly held that Act No. 2017-131, Ala. Acts 2017, does not apply to a defendant like Yeiter who was charged with capital murder before April 11, 2017, the effective date of Act No. 2017-131, but convicted and sentenced after that date."

trial court followed that recommendation and sentenced Gaston to death.

We now affirm Gaston's death sentence.

FACTS AND PROCEDURAL HISTORY

In our 2018 opinion this Court summarized the evidence in support

of Gaston's convictions:

"[O]n April 20, 2011, Gaston and Tyrone Thompson were at a friend's house with Gaston's brother, Patrick Watkins, and Tyrone's girlfriend, Cheryl Bush. According to Cheryl Bush, throughout the night she saw Gaston and Tyrone 'standing to the side' and 'whispering' to each other. Eventually, Gaston, Watkins, Tyrone, and Bush left their friend's house, dropping Watkins off 'on the east side' before taking Bush home. After dropping off Watkins and Bush, Tyrone telephoned Kevin Thompson[1] and asked if he could stop by Kevin's apartment that night. According to Kevin's sister, Rena Curry, Tyrone had known Kevin for many years and Kevin had been trying to 'steer [Tyrone] on the right path' in life. (R. 909.)

"Between 9:00 p.m. and 10:00 p.m., Kevin's neighbor, Martelli Smith, noticed 'two African-American males and one Caucasian female' standing outside the apartment complex near Kevin's silver Honda Civic automobile. (R. 934-35, 937, 939, 1005.) According to Smith, one male was 'kind of chubby,' while the other was 'small and small built.' (R. 935.)

"Around that time, Chris Wilkerson, Kevin's friend, was on the phone with Kevin. Wilkerson testified that he heard someone knock on Kevin's door and that he overheard Kevin say, 'I didn't know all of these people were coming with you.'

Like Yeiter, Gaston was charged with capital murder before April 11, 2017, and thus Act No. 2017-131 does not apply to his case.

3

(R. 923.) When the call suddenly disconnected, Wilkerson called Kevin back and Kevin told him that he would 'call [him] right back.' (R. 924.) Although Wilkerson continued to try to reach Kevin until 1:00 a.m., he testified that Kevin never answered his phone or called him back.

"The next day, when Kevin failed to report for work at Wellborn Elementary School, his colleagues became worried, so his school principal sent a school resource officer to Kevin's apartment to check on him. Because the apartment belonged to Kevin's sister, Rena Curry, however, the resource officer telephoned her and told her that Kevin had not shown up for work that day. Rena called her mother, Frances Curry, and then tried to reach Kevin on his cellular phone. When she could not reach Kevin on his cellular phone, Rena drove to the apartment. Frances also drove to the apartment and took alternate routes to determine whether Kevin had an automobile accident.

"When Rena and Frances arrived at Kevin's apartment, they noticed that he was not at home and that his car was gone. Rena and Frances found Kevin's front door unlocked, the lights and air conditioning on, and a lit candle that appeared to have burned all night. They also noticed that one of his shoes was outside on the ground and a 'trail' or 'skid mark' was nearby. (R. 716, 901, 943.) The matching shoe was found inside Kevin's apartment by the front door. Kevin's mother telephoned the police.

"Shortly thereafter, Cpl. Bill Deleon arrived at Kevin's apartment and noted that '[e]verything appeared to be normal' and that nothing inside the apartment was 'ransacked.' (R. 767, 773.) Cpl. Deleon testified that he remembered speaking with family members and neighbors but that he did not learn much other than someone mentioned that they had 'heard something' the night before. (R. 768.)

"Concerned that law-enforcement officials were not

4

doing enough to locate her son, Frances continued her search for Kevin. During the course of her search, Frances contacted Kevin's bank and learned that several withdrawals had been made from Kevin's account the previous night at various automatic-teller machines ('ATM'). Frances again contacted the Jacksonville Police Department to inform them of the unusual bank-account activity.

"Law-enforcement officers obtained surveillance footage from the credit unions and banks located in the Anniston and Jacksonville areas where unusual withdrawals had been made from Kevin's account. That footage revealed that Kevin's debit card was first used at 10:19 p.m. on April 20, 2011, at a drive-up ATM in Jacksonville. The driver, later identified as Nicholas Smith, wore a baseball cap with the letter 'A,' had a tattoo on his hand, and was driving Kevin's silver Honda Civic. (R. 964.) The passenger, whom Gaston later identified as himself, was dressed in a navy hoodie and white hat, was wearing a gold six-point star ring, and was holding a rifle with a camouflage pattern pointed at the backseat. Smith made 'nine or ten' attempts to withdraw money before he succeeded. (R. 964-65.) He then made four successive $100 withdrawals, leaving a balance of approximately $80 in Kevin's account. The footage showed Smith passing money to Gaston, who passed it to someone in the backseat. (R. 967.)

"Six minutes later, Smith drove across the road to the drive-up ATM at the Fort McClellan Credit Union. Photographs from the Anniston branch of the Fort McClellan Credit Union showed that a silver vehicle and a dark-colored sport-utility vehicle arrived at 12:13 a.m. on April 21, 2011. Smith and a second individual were shown at the ATM. (R. 954, 956.) Rena later recognized Tyrone as the second man in the footage. Police interviewed Tyrone on April 21, 2011, but Tyrone admitted only that he met Smith at the credit union after Smith called to ask Tyrone 'how to use a debit card at the ATM.' (R. 146-47.) Tyrone denied any knowledge of

5

Kevin's disappearance.

"According to testimony at trial given by Whitney Ledlow and Jessica Foster, Smith then went to the apartment shared by both Ledlow and Foster. Ledlow and Foster testified that, when Smith arrived at their apartment, he had a 'gash' on his face. (R. 1092, 1122.) Both women testified that they saw blood inside Smith's Ford Explorer sport-utility vehicle when they left to purchase alcohol around noon that day. When they asked Smith about the blood, he became 'real nervous,' 'wip[ed] everything down,' and threw 'a bunch of stuff in bags' in their trash can.

"According to Ledlow, they both then left with Smith and drove the Explorer to a nearby detail shop to have the interior cleaned. John Robinson, the owner of the detail shop, testified that, as he was cleaning Smith's Explorer, he noticed 'a lot of red splatters in different spots' that 'might have been blood.' (R. 1149-50.)

"While they waited for Smith's car to be detailed, Smith, Ledlow, and Foster went to Foster's mother's house in Stringfellow where Kevin's car had been hidden the night before. After deciding to strip Kevin's car, they picked up Blake Hamilton and Teddy Smith and then returned to Foster's mother's house to work on the car. While Hamilton and Teddy removed parts, Foster and Ledlow searched the interior for anything of value. They found a credit card, a gold diamond cluster ring, and a Kodak brand camera. Ledlow later pawned the diamond cluster ring for $200, which she gave to Smith. At some point, Foster's mother walked inside the garage and told everyone to leave. She then contacted the police about the car.

"After Smith, Ledlow, and Foster picked up Smith's Explorer, they parked the vehicle in the parking lot of a hospital in Anniston. They then attempted to find a trailer to dispose of Kevin's car. When they were unable to find one,

6

they considered setting Kevin's vehicle on fire. In the end, they drove another vehicle to Carrollton, Georgia, checked into the Royal Inn motel, and drove to a nearby Wal-Mart where they threw several items, including Kevin's checkbook, into a trash can. The next morning, Foster, Ledlow, and Smith were detained at Hartsfield Jackson Airport in Atlanta, Georgia.

"Foster told police where Smith had told them Kevin's body was located. Specifically, she told them that Kevin's body had been disposed of down an embankment near a set of guardrails on U.S. Highway 278. Based on that description, Investigator Seth Rochester of the Cherokee County Sheriff's Office was able to locate Kevin's body in the early morning hours of April 23, 2011. Dirt and leaves along the roadway appeared disturbed, as though 'some type of struggle or fight had occurred' at the guardrail. (R. 831, 1842.) Police officers also noticed what appeared to be two knee prints in the dirt. They also found tire tracks, cigarette butts, and several cans near the guardrail.

"After climbing down the steep embankment, police discovered Kevin's body facedown at the 'edge of the tree line where he [was] caught up in some brush,' with his body 'smeared with mud and dirt.' (R. 869, 1836.) Kevin's wrists were bound with duct tape and his injuries were substantial.

"Emily Ward, a state medical examiner with the Alabama Department of Forensic Sciences, performed the autopsy on Kevin's body. Dr. Ward noted a cut across the front of the neck, which was deep enough to have compromised the windpipe and left jugular vein. This injury caused blood to aspirate into Kevin's lungs. He also suffered four haphazard stab wounds to the left side of his chest—two pierced the heart and all four pierced the left lung. Dr. Ward stated that the orientation of the wounds suggested that Kevin's assailants were standing while he was in a submissive position on the ground. He sustained a contusion to the entire left side of his

7

face, consistent with punching or kicking. In Dr. Ward's opinion, this injury was caused by a 'tremendous' amount of force. (R. 753.) Kevin bore superficial abrasions on his extremities, which could have been caused by falling; bruises to his wrists, which were consistent with his wrists being bound by duct tape; and defensive wounds to his palms. Dr. Ward stated that, although the stab wounds and injury to the throat were severally fatal, Kevin's death was not quick because he did not sustain arterial bleeding. In Dr. Ward's opinion, he would have been aware of his injuries and would have experienced significant pain.

"Through their investigation, law-enforcement officers learned that Gaston had been with Tyrone the night Kevin went missing. Police officers were able to locate Gaston at his father's home, and Gaston agreed to accompany them to the police station for questioning. At that time, Taesha Pulliam, Gaston's on-and-off girlfriend, gave them a camouflage-patterned .50 caliber black-powder rifle Gaston had previously placed in her car.

"After being advised of his Miranda [v. Arizona, 384 U.S. 436 (1966),] rights, Gaston initially denied any knowledge of or involvement in Kevin's disappearance and death. Over the course of the interrogation, however, Gaston admitted that he was involved in the kidnapping and robbery of Kevin.

"According to Gaston, after he and Tyrone dropped off Watkins and Bush, they drove to Tyrone's house in Nicholas Smith's Explorer and waited for Smith. When Smith arrived with Kevin, driving Kevin's car, the four men drove Kevin's car to an ATM. Gaston noted that Kevin rode in the back because Gaston was 'too long' to sit comfortably in the backseat.

"Gaston stated that Smith already had Kevin's debit card and that he 'swiped it' at one of the ATMs in the area, and withdrew 'two or three hundred' dollars. (Supp. III R.

8

94.)[3] Smith then gave Gaston $40. Gaston further stated that when they attempted to withdraw money from the second ATM, the transaction was denied. At that point, Gaston and Tyrone separated from Kevin and Smith. When Gaston and Tyrone reunited with Smith after midnight that night and unsuccessfully tried to withdraw money from a third ATM at the Fort McClellan Credit Union, Gaston said, Kevin was no longer with them.

"When law-enforcement officers showed Gaston the security footage they obtained, Gaston identified himself in the front passenger seat with Smith in the driver seat. He also admitted that he had his camouflage-patterned rifle at that time but insisted that he was aiming the weapon at both Kevin and Tyrone and that he was 'just the gun man.' (Supp. III R. 95.) According to Gaston, at some point Tyrone asked him to shoot Kevin because he was concerned that Kevin could identify Tyrone as one of the individuals who robbed him. Gaston stated, however, that he refused to do so.

"He then told law-enforcement officers that the men drove down '[s]ome black dark ass road' and parked near a guardrail. (Supp. III R. 75, 84, 87.) Gaston claimed he was unaware that Kevin was bound in the trunk until Smith and Tyrone removed him and placed him on the side of the road. Gaston told police he saw Smith and Tyrone 'tussle' with Kevin, hitting him several times. According to Gaston, Smith stabbed Kevin and Kevin screamed. Smith then returned to the vehicle with a bloody, black-handled knife.[4]

"Gaston drove Kevin's car to Foster's mother's house in Stringfellow while Tyrone and Smith followed in Smith's Explorer. After leaving Kevin's car at Foster's mother's house, Tyrone drove Gaston, who sat in the backseat of the Explorer, to Taesha Pulliam's house.

"On May 13, 2011, Gaston was indicted on one count of murder made capital because it was committed during a

9

kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975, and one count of murder made capital because it was committed during a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. After attorneys David L. Johnston, Jr., and Tom Harmon were appointed to represent him, Gaston entered a plea of not guilty and a plea of not guilty by reason of mental disease or defect on both counts.

"Gaston's trial commenced on September 28, 2015, and seven days later the jury found him guilty of both charges. During the penalty phase, the jury found by special verdict forms that the State had established two aggravating factors beyond a reasonable doubt: (1) that Gaston committed the capital offenses while under a sentence of imprisonment[5] and (2) that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses.[6] On October 7, 2015, the jury recommended by a vote of 10 to 2 that Gaston be sentenced to death.

"On November 12, 2015, the circuit court accepted the jury's recommendation and sentenced Gaston to death. In doing so, the circuit court found that the mitigating circumstances[7] in Gaston's case were substantially outweighed by the aggravating circumstances.

"_____

"[1]Kevin Thompson is not related to Tyrone Thompson.

"....

"[3]Citations to the transcript of Gaston's statement to police found in the third volume of the supplemental record will be denoted with (Supp. III R. ___.)

"[4]A serrated stainless-steel knife with a black plastic handle was recovered from the outdoor trash can where Whitney Ledlow and Jessica Foster lived. (R. 1425.) Forensic

testing revealed Kevin Thompson's blood was on the knife. (R. 1928-29.)

"[5]At the time of Kevin's murder, Gaston was on probation for second-degree unlawful possession of marijuana, see § 13A-12-214, [Ala. Code 1975,] possession of drug paraphernalia, see § 13A-12-260, Ala. Code 1975, and possession of a pistol without a permit, see § 13A-11-73, Ala. Code 1975, and § 13A-11-84, Ala. Code 1975.

"[6]Those aggravating factors were in addition to the aggravating factors established by the jury's guilty verdict: that the murder was committed while the defendant was engaged in a robbery and while the defendant was engaged in a kidnapping, see § 13A-5-49(4), Ala. Code 1975.

"[7]Those mitigating circumstances found to exist by the circuit court were Gaston's lack of significant criminal history and his tumultuous childhood. (C. 225-31.)"

265 So. 3d at 396-400.

This Court affirmed Gaston's capital-murder convictions, but we reversed the death sentence and remanded the case for the trial court to hold a new penalty proceeding. Gaston, 265 So. 3d at 444. This Court found plain error during the penalty phase of Gaston's trial when the trial court allowed "the State to elicit and to argue the opinions of Thompson's family to persuade the jury to recommend a death sentence" and "did not instruct the jury on how to consider this victim-impact

11

testimony."[2] 265 So. 3d at 443-44.

On remand, the trial court held a new penalty-phase proceeding. The State introduced evidence from the guilt phase, including videotape and still photographs from ATM footage, cellular-telephone records, Gaston's statement to law-enforcement officers, Dr. Emily Ward's testimony, and certified copies of Gaston's prior convictions for which he was on supervised probation at the time of Thompson's murder.

Gaston's evidence at the penalty phase included testimony from his father John Foster; from Keyara Pulliam, the sister of Gaston's son; and from Gaston's friends Devereaux Dennis and Donal Brown. Foster testified about Gaston's childhood, stating that he was a loving son and that he made good grades and completed his chores. (R. 682-85.) Foster acknowledged that he was not "around as much" when Gaston was older. (R. 685.)

Pulliam testified that Gaston had treated her like she was his own child and that she still spoke with him "two or three times a week." (R.

---

[2]This Court reversed the death sentence of Gaston's codefendant Smith on the same basis. See Smith v. State, 246 So. 3d 1086 (Ala. Crim. App. 2017). This Court affirmed the judgment imposing a death sentence on Smith after a second penalty proceeding. See Smith v. State, [Ms. CR-2022-0504, June 28, 2024] ___ So. 3d ___ (Ala. Crim. App. 2024).

688, 692.) Dennis and Brown testified that they worked with Gaston through a nonprofit organization that Gaston helped create with Dennis to help others "not end up" like Gaston. (R. 699.) Dennis testified that Gaston had helped organize toy drives and had taught "a course … on rehabilitation" at the prison. (R. 701.) Brown testified about the organization's community-outreach efforts. (R. 707.)

Gaston also introduced prison records showing (1) that he had received three prison disciplinaries since he had been incarcerated—two for possessing a cellular phone and one for failing to obey a command—and (2) that he had completed 8 to 10 courses in prison, including classes on anger and stress management, self-awareness, self-esteem, and values. (R. 455-58.)

Besides the two aggravating circumstances that the State had proved beyond a reasonable doubt at Gaston's guilt-phase proceeding (i.e., that the capital offense was committed during the course of a first-degree kidnapping and during the course of a first-degree robbery), the jury unanimously found that the State had proved two more aggravating circumstances beyond a reasonable doubt—that Gaston committed the capital offense while under a sentence of imprisonment, see § 13A-5-

49(1), Ala. Code 1975, and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. (C. 96-97.) The jury recommended by a vote of 11 to 1 that Gaston be sentenced to death. (C. 98.) The trial court, finding that "the aggravating circumstances outweigh the mitigating circumstances," followed the jury's recommendation and sentenced Gaston to death. (C. 130.)

## STANDARD OF REVIEW

"Rule 45A, Ala. R. App. P., currently provides that,

"'[i]n all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'

"Before the current version of Rule 45A, the rules of preservation did not apply in cases in which the death penalty had been imposed, and this Court had to review the entire record for plain error. Although no longer required, this Court recently explained that it would continue to review the entire record for plain error in all cases in which the death penalty has been imposed. See Iervolino v. State, 402 So. 3d 844, 862 (Ala. Crim. App. 2023).

"Because this Court already conducted plain-error

14

review of [Gaston's] guilt-phase proceeding and affirmed his convictions for capital murder, our plain-error review in this case is limited to [Gaston's] second penalty-phase proceeding. See Jerry Jerome Smith v. State, 387 So. 3d 150, 161 n.2 (Ala. Crim. App. 2022) ('This Court has already affirmed Smith's capital-murder conviction; thus, it has already reviewed the guilt phase of Smith's trial for plain error. Consequently, we do not review for plain error anything that occurred during the guilt phase of his trial. Instead, our plain-error review is limited to Smith's sixth penalty-phase proceeding.').

"In conducting plain-error review of [Gaston's] second penalty-phase proceeding, we apply the following standard:

"'"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). "The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant." Ex parte Trawick, 698 So. 2d at 167. "[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no

15

> evidence to support the alleged error, does not establish an obvious error." Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, "[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial." Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). "[T]he plain error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)).'
>
> "DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018)."

Smith v. State, [Ms. CR-2022-0504, June 28, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024).

## DISCUSSION

Gaston raises five issues on appeal. We address each in turn.

## I. THE JURY'S RECOMMENDATION OF A DEATH SENTENCE

Gaston asserts that the United States Constitution requires "a unanimous jury verdict as to whether the aggravating circumstances … are outweighed by the mitigating factors." (Gaston's brief, p. 41.) He argues that this Court's decision in State v. Billups, 223 So. 3d 954 (Ala.

16

Crim. App. 2016), on this issue misapprehends Apprendi v. New Jersey, 530 U.S. 466 (2000), Ring v. Arizona, 536 U.S. 584 (2002), and Hurst v. Florida, 577 U.S. 92 (2016).

Gaston raised this issue in a motion after the jury's 11-to-1 vote to recommend a death sentence.[3] (C. 104.) The issue lacks merit, as both this Court and the Alabama Supreme Court have decided this issue adversely to Gaston. See, e.g., Ex parte Bohannon, 222 So. 3d 525 (Ala. 2016); State v. Billups, 223 So. 3d 954 (Ala. Crim. App. 2016).

---

[3]Before its sentencing recommendation, the penalty-phase jury unanimously found the existence of two aggravating circumstances—that Gaston committed the capital offense while under a sentence of imprisonment and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. And the verdict of the guilt-phase jury established these two aggravating circumstances—that the capital offense was committed during the course of a first-degree kidnapping and during the course of a first-degree robbery. Cf. Brooks v. State, 973 So. 2d 380, 415-16 (Ala. Crim. App. 2007) ("Both this Court and the Alabama Supreme Court have repeatedly upheld the practice of 'double counting' or 'overlapping.' See Clark v. State, 896 So. 2d 584, 644-45 (Ala. Crim. App. 2000), and the cases cited therein. See also § 13A-5-50, Ala. Code 1975 ('The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'), and § 13A-5-45(e), Ala. Code 1975 ('[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.').").

In <u>Lane v. State</u>, 327 So. 3d 691 (Ala. Crim. App. 2020), this Court stated:

> "Lane argues that Alabama's former capital-sentencing scheme, under which he was sentenced, is unconstitutional under <u>Hurst v. Florida</u>, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), and <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and that his death sentence must therefore be reversed. Specifically, Lane argues that <u>Hurst</u> and <u>Ring</u> prohibit a capital-sentencing scheme that provides that the jury's sentencing verdict is a recommendation and that allows the jury to recommend a death sentence on a less-than-unanimous verdict. These claims have been repeatedly rejected by the Alabama Supreme Court. <u>See, e.g.</u>, <u>Ex parte Bohannon</u>, 222 So. 3d 525, 534 (Ala. 2016) ('[T]he making of a sentencing recommendation by the jury and the judge's use of the jury's recommendation to determine the appropriate sentence does not conflict with <u>Hurst</u>.'); <u>Capote v. State</u>, 323 So. 3d 104, 150 (Ala. Crim. App. 2020) (noting that the Alabama Supreme Court 'has repeatedly construed Alabama's capital-sentencing scheme as constitutional under <u>Ring</u>'); and <u>Brownfield v. State</u>, 44 So. 3d 1, 39 (Ala. Crim. App. 2007) (rejecting claim that jury's sentencing recommendation must be unanimous and noting that 'both this Court and the Alabama Supreme Court have upheld death sentences imposed after the jury made a less-than-unanimous recommendation that the defendant be sentenced to death')."

327 So. 3d at 776-77.

Gaston is due no relief on this issue.

## II. COMMENTS BY THE PROSECUTOR DURING CLOSING ARGUMENT

Gaston challenges comments the prosecutor made during closing

18

arguments. (Gaston's brief, p. 43.) In <u>Lee v. State</u>, 898 So. 2d 790 (Ala. Crim. App. 2001), this Court stated these principles in addressing an appellant's contention that the prosecutor's comments were improper:

> "Throughout the trial, the trial court repeatedly instructed the jury that statements made by the attorneys were not evidence, that the jury was required to base its decision upon the evidence presented during the proceedings, and that the jury was not to base its decision on passion, prejudice, or any other arbitrary factor. We presume that the jury followed the trial court's instructions. See <u>Taylor v. State</u>, 666 So. 2d 36 (Ala. Crim. App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995). In judging a prosecutor's closing argument, the standard is whether the argument '"so infected the trial with unfairness as to make the resulting conviction a denial of due process."' <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974)).

> > "'In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. <u>Whitlow v. State</u>, 509 So. 2d 252, 256 (Ala. Cr. App. 1987); <u>Wysinger v. State</u>, 448 So. 2d 435, 438 (Ala. Cr. App. 1983); <u>Carpenter v. State</u>, 404 So. 2d 89, 97 (Ala. Cr. App. 1980), <u>cert. denied</u>, 404 So. 2d 100 (Ala. 1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. <u>Orr v. State</u>, 462 So. 2d 1013, 1016 (Ala.

19

Cr. App. 1984); <u>Sanders v. State</u>, 426 So. 2d 497, 509 (Ala. Cr. App. 1982).'

"<u>Bankhead v. State</u>, 585 So. 2d 97, 106-07 (Ala. Crim. App. 1989), aff'd in relevant part, 585 So. 2d 112, 127 (Ala. 1991), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993). Finally,

"'"[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference." <u>Rutledge v. State</u>, 523 So. 2d 1087, 1100 (Ala. Cr. App. 1987), rev'd on other grounds, 523 So. 2d 1118 (Ala. 1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. <u>Racine v. State</u>, 290 Ala. 225, 275 So. 2d 655 (1973). "In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits," <u>Hooks v. State</u>, 534 So. 2d 329, 354 (Ala. Cr. App. 1987), aff'd, 534 So. 2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S. Ct. 883, 102 L. Ed. 2d 1005 (1989) (citations omitted) (quoting <u>Barnett v. State</u>, 52 Ala. App. 260, 264, 291 So. 2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, <u>Duren v. State</u>, 590 So. 2d 360 (Ala. Cr. App. 1990), aff'd, 590 So. 2d 369 (Ala. 1991). "In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury." <u>Mitchell v. State</u>, 480 So. 2d 1254, 1257-58 (Ala. Cr. App. 1985) (citations omitted). "To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted." <u>Twilley v. State</u>, 472 So. 2d 1130, 1139 (Ala. Cr. App. 1985) (citations omitted).'

20

"Coral v. State, 628 So. 2d 954, 985 (Ala. Crim. App. 1992), aff'd, 628 So. 2d 1004 (Ala. 1993)."

898 So. 2d at 820-21. With those principles in mind, we turn to Gaston's arguments on appeal.

### A. COMMENT THAT GASTON HAD "NO REMORSE"

During the State's rebuttal closing argument, the prosecutor stated:

"What do we know [Gaston] did not do when he got to Maple Drive? Did he call the police? Did he go to the police department? Did he tell them what he witnessed, what horrific thing he witnessed because he's a witness? No, he didn't do that. He waited for [law enforcement] to come find him. There is no remorse at any stage at any point in this event, none. These self-esteem and self-help groups that he's been to, did you see a man on that video [of Gaston's statement to the police] that had a problem with esteem or a person who followed others?

"One of the mitigators they want you to consider is that he could have been under the domination of another person. Who? He had the gun. Who's dominating him? He told you, what, he was pointing the gun in the back seat at Tyrone because Tyrone wouldn't give him his money, I think his F-ing money. Does that sound like somebody who's under the domination and control of another? That's a person in control themselves. He holds the keys. He holds the power.

"What we did not hear was how he—how [Gaston] once he got to Weaver was so overcome and remorseful that he called the police. He just witnessed this brutal, unforgiving, unrelenting homicide, but he didn't call the police. He didn't

21

tell anybody what happened. He didn't call the police and tell the police that there was this brutal homicide and there's this young man lying on the side of the road, maybe he's dead, maybe he's severely injured. He didn't tell them that. He left Kevin up there like a piece of garbage with those beer bottles and that debris and that rubbish while he went home and laid in a bed comfortable within himself and not concerned with the whereabouts or telling the police about Kevin. He left him like garbage, trash. Who does that? Not somebody who's remorseful and thoughtful of others but someone who is uncaring, insensitive, and deserving of the ultimate punishment. He left him, just left him there, for how many days? Couple of days. <u>There is no remorse, not even today. He sits there with no remorse.</u>

"And when he got to the police station to give a statement to the police did he say, oh, my God, thank you for finding me, thank you, thank you? I need to tell you what happened. I need to tell you about that young man on the side of the road. Thank you for finding me. No, he didn't say that. This defendant does not deserve your sympathy, your forgiveness."

(R. 752-54 (emphasis added).)

After the rebuttal closing, Gaston moved for a mistrial. Citing the statements emphasized above, Gaston argued that the State had "made a direct statement about Mr. Gaston's failure to testify in this case." (R. 757.) The trial court denied the motion. (R. 758.)

On appeal, Gaston asserts that the statement at issue was an improper comment on Gaston's failure to testify: "While [Gaston] will admit that this is not a direct statement about his failure to testify, it is

22

an inappropriate inference that the State is placing in the jury's mind." (Gaston's brief, p. 44.) He argues that the statement violated <u>Griffin v. California</u>, 380 U.S. 609 (1965), and that it was "false" because Gaston "in the video statement played for the jury made repeated statements indicating that he did not want the victim to die, he did not wish to participate in his death, had not intended the victim's death and did not believe the victim deserved to die." (Gaston's brief, p. 44.)

Although Gaston moved for a mistrial, the motion was untimely, and thus we review this issue only for plain error. <u>See, e.g.</u>, <u>Finney v. State</u>, 860 So. 2d 367, 383 (Ala. Crim. App. 2002) ("Finney's motion for a mistrial, made after the State had concluded its rebuttal argument was not timely and thus did not preserve her claims for review. See, e.g., <u>Wilson v. State</u>, 651 So. 2d 1119, 1122 (Ala. Crim. App. 1994) (a motion for a mistrial 'is untimely if it is not made until the conclusion of the witness's testimony or counsel's argument').").

During closing argument, Gaston's counsel asserted that Gaston had not intended for Kevin Thompson to be murdered. Counsel cited, as a reason to vote for life imprisonment without the possibility of parole, "if you feel like somebody shows remorse or wants to improve themselves or

23

wants to try and give back." (R. 743.) In context, the prosecutor's statements were made to rebut Gaston's plea for mercy based on his deeds and to rebut his theory of defense that he did not intend for Kevin to be murdered. See Lee, 898 So. 2d at 821.

Also, "'"[t]he conduct of the accused or the accused's demeanor during the trial is a proper subject of comment."'" Jackson v. State, 169 So. 3d 1, 48 (Ala. Crim. App. 2010) (quoting Thompson v. State, 153 So. 3d 84, 175 (Ala. Crim. App. 2012), quoting in turn Wherry v. State, 402 So. 2d 1130, 1133 (Ala. Crim. App. 1981)). And "'remorse is a proper subject of argument during the sentencing phase of a capital trial.'" Jackson, 169 So. 3d at 48 (quoting Perkins v. State, 808 So. 2d 1041, 1132-33 (Ala. Crim. App. 1999), aff'd, 808 So. 2d 1143 (Ala. 2001), vacated on other grounds, 536 U.S. 953 (2002)). Accord Knight v. State, 300 So. 3d 76, 120 (Ala. Crim. App. 2018) ("A defendant's lack of remorse is a proper argument in the penalty phase. … [T]he prosecutor's comments were not a direct or even indirect comment on Knight's failure to testify. No error resulted, plain or otherwise, from the prosecutor's comments."). The prosecutor's comments about Gaston showing no remorse were not a comment on his failure to testify, and no error, plain or otherwise,

resulted from those comments. Gaston is due no relief.

## B. ALLEGEDLY FALSE STATEMENTS

Gaston cites three statements by the prosecutor that Gaston asserts were "false statements of the evidence [that] might have influenced the jury in its decision to recommend death in this matter"—(1) the prosecutor's statement that Gaston "admitted to taking the vehicle to a garage on Rocky Hollow"; (2) the prosecutor's statement that the medical examiner "testified that the victim would have been making gurgling noises"; and (3) the prosecutor's comment that "the medical examiner testified that the victim was on the ground when he was being stabbed." (Gaston's brief, p. 45.) Gaston did not object to these statements, and thus we review this issue for plain error. Iervolino v. State, 402 So. 3d 844, 882 (Ala. Crim. App. 2023) ("Iervolino did not object to many of the remarks by the prosecutor that he now challenges on appeal. Those remarks that were not objected to in the trial court were not properly preserved for review and are subject only to plain-error review.").

Gaston cites only one authority in this part of his argument—Donnelly v. DeChristoforo, 416 U.S. 637 (1974)—and only for the general

propositions that the relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process" and that the prosecutor has a duty to be thoughtful and truthful in the penalty phase. (Gaston's brief, p. 46.) This fails to satisfy Rule 28(a)(10), Ala. R. App. P.

> "'Rule 28(a)(10) requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, <u>with citations to the cases, statutes, other authorities</u>, and parts of the record relied on." (Emphasis added.) Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed. <u>Hamm v. State</u>, 913 So. 2d 460, 486 (Ala. Crim. App. 2002). "Authority supporting only 'general propositions of law' does not constitute a sufficient argument for reversal." <u>Beachcroft Props., LLP v. City of Alabaster</u>, 901 So. 2d 703, 708 (Ala. 2004) (quoting <u>Geisenhoff v. Geisenhoff</u>, 693 So. 2d 489, 491 (Ala. Civ. App. 1997)). The Alabama Supreme Court has explained:
>
> > "'"[I]t is not the function of this court to do a party's legal research. See <u>Henderson [v. Alabama A&M University]</u>, 483 So. 2d [392,] 392 [(Ala. 1986)]. Similarly, we cannot create legal arguments for a party based on undelineated general propositions unsupported by authority or argument. Ala. R. App. P. 28(a)(5) [now Rule 28(a)(10), Ala. R. App. P.]; <u>Brittain v. Ingram</u>, 282 Ala. 158, 209 So. 2d 653 (1968) (analyzing the predecessor to Ala. R. App. P. 28); <u>Ex parte Riley</u>, 464 So. 2d 92 (Ala. 1985)."

26

"'Spradlin v. Spradlin, 601 So. 2d 76, 78-79 (Ala. 1992). To obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error occurred and that the alleged error should result in reversal.'"

Alonso v. State, 228 So. 3d 1093, 1108 (Ala. Crim. App. 2016) (quoting White v. State, 179 So. 3d 170, 227 (Ala. Crim. App. 2013)). "[I]t is not the duty of the appellate court to search the record for evidence to support an appellant's contention of error." Certain Underwriters at Lloyd's, London v. Southern Nat. Gas. Co., 142 So. 3d 436, 453 (Ala. 2013). "The purpose of Rule 28, Ala. R. App. P., outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." Ex parte Borden, 60 So. 3d 940, 943 (Ala. 2007).

Even so, no plain error occurred.

"'"This court has concluded that the failure to object to improper prosecutorial arguments, ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."' Kuenzel v. State, 577 So. 2d 474, 489 (Ala. Crim. App. 1990), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n.6 (11th Cir. 1985). 'Prosecutorial misconduct during closing arguments rarely constitutes plain error that requires reversal.' People v. Walters, 148 P.3d 331, 335 (Colo. App. 2006). '"[T]he impropriety of the argument must be gross indeed in order for

27

this Court to hold that a trial judge abused his discretion in not recognizing and correcting ex mero motu an argument which defense counsel apparently did not believe was prejudicial when he heard it." State v. Johnson, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).' State v. Gregory, 340 N.C. 365, 424, 459 S.E.2d 638, 672 (1995)."

Iervolino, 402 So. 3d at 882.

The first challenged remark—that the prosecutor asserted that Gaston admitted to "taking a vehicle to a garage on Rocky Hollow" when no evidence showed that Gaston "was ever at the Rocky Hollow address"—was an apparent misstatement that the prosecutor corrected in rebuttal. During initial closing arguments, the prosecutor stated:

"Where are Kevin's car keys, the car keys to the Honda? They're not in evidence. To my knowledge, they were never found. The car was taken apart but not hotwired. Okay?

"So what do we know from the evidence that we have heard? That when Nick Smith got behind the wheel of Kevin's car he had those car keys in the car operating it, right? Then later when Jovon Gaston drove that same Honda and parked it in the garage on Rocky Ridge, what did he have? Those car keys. Ultimately the car is found. Kevin has been in the trunk. There's all the evidence found. There's no car keys. …"

(R. 722.) Discussing the timeline of events, the prosecutor stated:

"Then the next thing you know, according to the timeline is the purchase of the duct tape. All right. When is the duct tape applied? We may never know. It's before he died. It's on him when is killed. But when is the duct tape applied? I don't know. But what does the defendant, Jovon Gaston, tell you?

28

That he drove that Honda, put it in the garage at Rocky Hollow.

"All right. So then some period of time expires and they go to Cherokee County. He says in two cars. One car containing Nick Smith and purportedly Kevin Thompson. He said he never sees Kevin Thompson again. He doesn't know where he is. Okay? The other car containing Jovon Gaston and Tyrone Thompson. All right. If you were to believe that, what does the evidence tell you? Whose blood is in the driver's side seat? Kevin Thompson.

"Okay. Where has Kevin been this whole time? According to Jovon Gaston, he's been in the silver Honda …. He's been in the trunk of the gray Honda."

(R. 725-26.) On rebuttal, the prosecutor noted that Tyrone, Gaston, and Smith "rode back together" and that "Tyrone drop[ped] [Gaston] off in Weaver." (R. 751-52.)

The trial court instructed the jury that the attorneys' arguments were not evidence. (R. 449, 716.) We presume the jury followed the jury's instructions. See Lee, 898 So. 2d at 820.

The next statements Gaston challenges are the prosecutor's remarks during rebuttal closing about whether Kevin made "gurgling noises" and whether he was on the ground when he was stabbed. (R. 750-51.) Testimony from Dr. Ward during the guilt phase supported both

29

statements.[4] (2d Supp. R. 23-24, 32-33.). That testimony was read into

the record for the jury during the penalty phase. Her testimony supported

the prosecutor's impression of the evidence. See Lee, 898 So. 2d at 821;

Johnson v. State, 120 So. 3d 1130, 1164 (Ala. Crim. App. 2009) ("Here,

the 'prosecutor's comments were based on evidence that had been

introduced or were a legitimate inference that could have been drawn

---

[4]Dr. Ward testified:

> "Q. … And this particular injury that you're talking about, how would you expect or anticipate the body would react as far as what would be going with him in his throat? Would he be able to speak? Would he be able to make any sound based on your training and experience?
>
> "A. He might be able to utter some gurgling sounds, but I don't think we could tell with certainty that he was intentionally making those sounds as just that the sound of the blood being sucked into his lungs would make a gurgling sound."

(2d Supp. R. 23-24.) Dr. Ward also testified:

> "A. … It could be that [Kevin] was bent over and the knife was going straight in and then when we stand him up and straighten him the wound will appear to be going downward. It's just as possible from examining the wound that the person who was stabbing him was over him somehow, either he was on the ground or sitting and the person was standing up just at some point higher above the ground."

(2d Supp. R. 33.)

30

from the evidence.' <u>See</u> <u>Ballard [v. State</u>, 767 So. 2d 1123, 1135 (Ala. Crim. App. 1999)]." (quoting <u>Smith v. State</u>, 213 So. 3d 255, 285 (Ala. Crim. App. 2007), <u>aff'd in part, rev'd in part on other grounds</u>, 213 So. 3d 313 (Ala. 2010))).

## III. SUFFICIENCY OF THE EVIDENCE TO SUPPORT GASTON'S DEATH SENTENCE

Gaston asserts that his death sentence is improper because, he says, "the evidence is clear that [Gaston] did not commit or participate in the actual murder of the victim, Kevin Thompson." (Gaston's brief, p. 47.) He asserts that he "refused to give his codefendants his gun to use to kill the victim." (<u>Id.</u>) And, he says, he remained inside the vehicle while Kevin was stabbed. (<u>Id.</u>)

Although Gaston couches this challenge as one under the Eighth Amendment to the United States Constitution,[5] it is a challenge to the sufficiency of the evidence to show that he was guilty of capital murder under accomplice liability. This Court has decided that question adversely to Gaston. <u>Gaston</u>, 265 So. 3d at 437-41.

"This Court has previously held that the death penalty

---

[5]The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

can be imposed upon a nontriggerman accomplice so long as there is proof that he was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony. See Gamble v. State, 791 So. 2d 409, 446 (Ala. Crim. App. 2000). '[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the princip[al] wrongdoer. ... As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt.' Price v. State, 725 So. 2d 1003, 1055 (Ala. Crim. App. 1997) (citations omitted); see also §§ 13A-2-20 through 13A-2-23 and 13A-5-40(c), Ala. Code 1975.

"… [T]he evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that Gaston aided and abetted Tyrone Thompson and Nicholas Smith in killing Kevin Thompson. As such, whether Gaston stabbed Kevin is of no legal consequence. Thus, his death sentence was proper, and his claim here is without merit."

265 So. 3d at 441. See also Doster v. State, 72 So. 3d 50, 96 (Ala. Crim. App. 2010). Gaston is due no relief on this issue.

## IV. THE TRIAL COURT'S FAILURE TO ORDER ANOTHER COMPETENCY EVALUATION

Gaston asserts that the trial court should have sua sponte ordered a competency evaluation before holding the penalty-phase proceedings. (Gaston's brief, p. 49.) This claim is raised for the first time on appeal and thus is subject to plain-error review. See Rule 45A, Ala. R. App. P., Luong v. State, 199 So. 3d 173, 193 (Ala. Crim. App. 2015) ("Luong did not move

32

for a formal competency hearing—this claim was never presented to the circuit court. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R. App. P.").

During his first trial proceedings, Gaston repeatedly expressed dissatisfaction with his trial counsel. 265 So. 3d at 406. In July 2021, before the second penalty phase, Gaston filed several pro se motions, including one seeking to represent himself. His counsel at the time Bill Broome filed a response to Gaston's request to represent himself. Broome asserted that in his opinion Gaston "currently lack[ed] the competency to represent himself." (C. 19.) In support of his response, Broome included a declaration from Olivia Ensign, who had represented Gaston in his first appeal. In her declaration, Ensign asserted that she had met with Gaston 17 times since 2016 and had talked with him by phone many other times. She asserted that she did "not believe he is competent to represent himself at this time." (C. 23.) Ensign stated that she had "observed signs and symptoms of mental illness that impact [Gaston's] ability to rationally understand the charges against him" and that would "almost certainly … interfere with his ability to carry out the necessary defense tasks." (C. 23.) Ensign asserted:

"10. I have seen these symptoms wax and wane over time, but among those that repeatedly reoccur are paranoia, delusions of grandeur, hyper religiosity, and an inability to grasp the law or proceedings governing his case.

"11. For instance, Mr. Gaston has expressed that attorneys from the State and defense are secretly working together and only pretending to argue while in court. He has repeatedly mentioned being tricked by his trial lawyers. He has also repeatedly expressed that people in power are plotting against him.

"12. At various points he has expressed that the apocalypse is imminent, that he is a god, a savior, and that he is immortal.

"13. He has shown that he does not understand the law or procedures in his case. He has expressed that the indictment was illegal and insufficient, that the court does not have jurisdiction over him, and has failed to grasp the scope of a resentencing. He is fixated on his belief that the facts underlying his conviction are insufficient to establish First-Degree Murder, and cannot appreciate that this claim is outside the scope of the resentencing hearing. He falsely believes that release is a possible outcome of his resentencing hearing.

"14. In the last two years, marked by the COVID-19 global pandemic, I have noticed a worrying decline in Mr. Gaston's mental health in our phone conversations and letters. Among other symptoms, he has seemed depressed and has expressed fear of being poisoned in the prison. To the best of my knowledge, he is currently being housed in a solitary unit and has very limited human contact.

"15. Based on my recent discussions with Mr. Gaston, I do not think he is currently capable of the legal or factual understanding necessary to represent himself.

34

"16. I do not believe he is capable of complying with the rules and procedure of trial, especially a complex capital resentencing trial. I was not surprised, for example, when Mr. Broome told me that Mr. Gaston initially filed his very motion to represent himself under the incorrect case number. Mr. Gaston also lacks an understanding of the kinds of arguments [that] could be raised in his defense at his trial.

"[17]. If Mr. Gaston is permitted to represent himself and receives the death penalty, it will be impossible to exclude his mental illness and inability to represent himself as causes of the death sentence. This would not only be a death sentence based on an arbitrary and impermissible factor but would also be a death sentence in spite of mitigation that, if properly presented, could be considered a basis for a sentence of less than death.

"[18]. Given my impressions and interactions with Mr. Gaston over the past five years and, particularly given his marked decompensation in the last two years, I believe it would be inappropriate and unconstitutional to allow Mr. Gaston to proceed pro se."

(C. 23-25.)  Gaston argues that it was "incumbent upon the [trial] court to protect the due process rights of [Gaston]." (Gaston's brief, p. 49.) Based on Broome's response, the assertions from Ensign, and the trial court's own observations of Gaston, he argues that "the court should have ordered a competency evaluation prior to the commencement of the resentencing hearing." (Gaston's brief, p. 51.)

As the State points out, Gaston's arguments in his initial brief are

founded on his mistaken assertion that, "[i]n this matter, no [competency] evaluation was sought or conducted." (Gaston's brief, p. 52.) Before his first trial, however, the trial court granted the State's motion for Gaston to undergo a mental evaluation. Gaston, 265 So. 3d at 408. Dr. Glen D. King evaluated Gaston in June 2012 and opined that he was not mentally ill at the time of the offense and that he was competent to stand trial. (Record in CR-15-0317, 2d Supp. C. 10-15.) Further evaluations of Gaston continued through June 2015. Gaston, 265 at 408 n.12.[6] Thus, Gaston's argument on appeal is that the trial court should have sua sponte ordered another competency evaluation of Gaston.

> "The United States Supreme Court in Pate v. Robinson[, 383 U.S. 375 (1966),] held that a trial court must conduct a competency hearing when it has a 'reasonable doubt' concerning the defendant's competency to stand trial. That

---

[6]In his reply brief, Gaston cites Williams v. State, 386 So. 2d 506 (Ala. Crim. App. 1980), as "an example of an individual who was initially declared competent and then found not to be." (Gaston's reply brief, p. 4.) Williams is distinguishable. That case involved vast evidence of mental illness and incapacity not present here—including that Williams had been institutionalized for more than two decades after his discharge from the Army in 1954, that he required medication "to stay sane," that he had eaten off the floor and washed his face in the commode, that he had to be bathed and shaved, that he had intentionally set fire to his cell, that he was "delusional, completely out of contact with reality," and that a psychiatrist had diagnosed him as a paranoid schizophrenic. 386 So. 2d at 508-11.

Pate holding is incorporated into § 15-16-22, Ala. Code 1975. That section reads, in pertinent part:

> " '(a) Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, that there is <u>reasonable ground to believe that such defendant may presently lack the capacity to proceed or continue to trial</u>, as defined in Section 22-52-30, [Ala. Code 1975,] or whenever said judge receives notice that the defense of said defendant may proceed on the basis of mental disease or defect as a defense to criminal responsibility; it shall be the duty of the presiding judge to forthwith order that such defendant be committed to the Department of Mental Health and Mental Retardation for examination by one or more mental health professionals appointed by the Commissioner of the Department of Mental Health and Mental Retardation.'

"(Emphasis added.)"

Luong, 199 So. 3d at 194.

> " 'A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.' Rule 11.1, Ala. R. Crim. P. 'The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency, and this is a matter within the discretion of the trial court.' Cliff v. State, 518 So. 2d 786, 790 (Ala. Crim. App. 1987). 'In order to overturn the trial judge's competency determination, we must find that the judge abused his or her discretion.' Tankersley v. State, 724 So. 2d 557, 565 (Ala.

Crim. App. 1998). '"In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's sanity and warrant an inquiry into his competency."' Id., quoting Cliff, 518 So. 2d at 791.

"'"[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." [Card v. Singletary, 981 F.2d 481] at 487-88 [(11th Cir. 1992)] (quoting United States ex rel. Foster v. DeRobertis, 741 F.2d 1007, 1012 (7th Cir.), cert. denied, 469 U.S. 1193, 105 S. Ct. 972, 83 L. Ed. 2d 975 (1985)). Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. McCune v. Estelle, 534 F.2d 611, 612 (5th Cir. 1976). The fact that a defendant has been treated with anti-psychotic drugs does not per se render him incompetent to stand trial. Fallada [v. Dugger], 819 F.2d [1564] at 1569 [(11th Cir. 1987)].'

"Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995)."

Hodges v. State, 926 So. 2d 1060, 1068-69 (Ala. Crim. App. 2005). See also State v. Glass, 375 So. 3d 151, 157 (Ala. Crim. App. 2022) ("'[T]he law is clear that [p]roof of the incompetency of an accused to stand trial involves more than simply showing that the accused has mental problems or psychological difficulties.' Connally v. State, 33 So. 3d 618, 621-22 (Ala. Crim. App. 2007) (quotations omitted).").

Gaston has not shown that any reasonable ground existed requiring the trial court to order another competency evaluation. See Roberts v. State, 62 So. 3d 1071, 1078 (Ala. Crim. App. 2010) ("Based on the evidence Roberts presented at the hearing, she did not prove that her condition had significantly changed since that earlier evaluation."); Eathorne v. State, 448 So. 2d 445, 448 (Ala. Crim. App. 1984) ("Here, Eathorne did not prove that his condition had significantly deteriorated between the time he was found competent to stand trial and the time he [pleaded] guilty. Unless the circumstances change, an accused is not entitled to a separate determination of his competence to plead guilty after being found competent to stand trial because the same standard applies. United States ex rel. Heral v. Franzen, 667 F.2d 633, 638 (7th Cir. 1981). See also Atwell v. State, 354 So. 2d 30 (Ala. Cr. App. 1977), cert. denied, Ex parte Atwell, 354 So. 2d 39 (Ala. 1978); Annot. 37 A.L.R. Fed. 356 (1978).").

Gaston filed pro se motions asserting his dissatisfaction with his trial counsel, requesting the trial court to declare the death penalty unconstitutional, and requesting the trial to grant him a speedy disposition of his case. (C. 10-18.) Other than Broome's response, which

included Ensign's declaration, Gaston cites no other evidence or conduct that the trial court observed that was unusual or that should have alerted the trial court that his competency was in question. The purpose of Broome's response was to oppose Gaston's request to proceed pro se, not to show that Gaston's competency should be evaluated.

The trial court had multiple chances to review Gaston's demeanor in court, including a hearing on his pro se motions. Gaston acknowledged during a pretrial hearing in August 2022 that he understood that death was a "potential punishment" in his case. (R. 14.) Although evidence was offered questioning Gaston's ability to proceed pro se, no evidence was offered suggesting Gaston was incompetent. Cf. Lindsay v. State, 326 So. 3d 1, 18 (Ala. Crim. App. 2019) (finding that the trial court "had no 'reasonable grounds' to make any further inquiry into Lindsay's competency to stand trial" when Lindsay had been found competent to stand trial and the trial court had an opportunity to observe Lindsay's demeanor in court, as well review pro se motions he filed).

No plain error occurred in the trial court's failure to order another competency evaluation of Gaston. Gaston is due no relief on this issue.

V. CHALLENGES TO THE DELAY IN THE NEW PROCEEDINGS

Gaston argues that the length of time between June 2018—when this Court issued a certificate of judgment making final our decision reversing Gaston's death sentence—and the new penalty-phase proceedings in October 2022 violated his rights. Gaston conflates different concepts to argue that the State should have lost "its right to seek the death penalty" due to the delay in holding the new penalty-phase proceedings. (Gaston's brief, p. 54.) He asserts, for example, that his trial counsel did nothing from 2018 until 2021 when Gaston filed his pro se motion for a speedy trial. (Gaston's brief, pp. 52-53.) He acknowledges that in Betterman v. Montana, 578 U.S. 437 (2016), the United States Supreme Court held that the Sixth Amendment[7] right to a speedy trial generally does not extend to sentencing, but he appears to ask this Court to extend speedy-trial protections to penalty-phase proceedings. (Gaston's brief, pp. 53-54.) He also argues that the delay in the proceedings violated his right to due process. (Gaston's brief, p. 53.)

We question whether Gaston's brief on this issue complies with

---

[7]The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial …." U.S. Const. amend. VI.

Rule 28(a)(10), Ala. R. App. P. Gaston's brief argument on this issue cites

only <u>Betterman</u> and <u>Strunk v. United States</u>, 412 U.S. 434 (1973). Even

so, the issue lacks merit.

In <u>Betterman</u>, the United States Supreme Court held that the right

to a speedy trial "detaches upon conviction." 578 U.S. at 443. The Court

stated:

> "[T]he guarantee protects the accused from arrest or indictment through trial, but does not apply once a defendant has been found guilty at trial or has pleaded guilty to criminal charges. For inordinate delay in sentencing, although the Speedy Trial Clause does not govern, a defendant may have other recourse, including, in appropriate circumstances, tailored relief under the Due Process Clauses of the Fifth and Fourteenth Amendments."

578 U.S. at 439.  In footnote 2, the Court

> "reserve[d] the question whether the Speedy Trial Clause applies to bifurcated proceedings in which, at the sentencing stage, facts that could increase the prescribed sentencing range are determined (<u>e.g.</u>, capital cases in which eligibility for the death penalty hinges on aggravating factor findings)."

578 U.S. at 441. In Gaston's case, however, the jury's guilt-phase verdict

included two aggravating circumstances. Thus, all the findings necessary

to make him eligible for the death penalty had happened before both of

his penalty-phase proceedings. <u>See</u> <u>supra</u> n.3. Therefore, the delay in

Gaston's second penalty-phase proceedings does not implicate the Sixth

Amendment.

We also hold that the delay in the proceedings did not violate Gaston's right to due process. Gaston offers no authority to support his due-process claim. In <u>Betterman</u>, the Court noted: "After conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair." 578 U.S. at 448. Gaston has not shown that any delay led to a fundamentally unfair proceeding. He does not, for example, assert that the delay prevented him from presenting any evidence or that the delay adversely affected him at all.

Gaston is due no relief on this issue.

## VI. THIS COURT'S INDEPENDENT REVIEW

Under § 13A-5-53, Ala. Code 1975, this Court is required to address the propriety of Gaston's capital-murder convictions and death sentence.

As discussed above, a jury convicted Gaston of two counts of capital murder, one count because it was committed during a kidnapping, <u>see</u> § 13A-5-40(a)(1), Ala. Code 1975, and one count because it was committed during a robbery, <u>see</u> § 13A-5-40(a)(2), Ala. Code 1975. The jury's verdict established the existence of two aggravating circumstances. See § 13A-5-

43

49(4), Ala. Code 1975. The jury at the second penalty-phase proceedings unanimously found that the State had proved two more aggravating circumstances—that Gaston committed the capital offense while under a sentence of imprisonment, see § 13A-5-49(1), Ala. Code 1975, and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. Thus, four aggravating circumstances were found to exist beyond a reasonable doubt. The jury then recommended by a vote of 11 to 1 that Gaston be sentenced to death. The trial court, finding that "the aggravating circumstances outweigh the mitigating circumstances," followed the jury's recommendation and sentenced Gaston to death. (C. 130.)

The record does not show that Gaston's death sentence was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.

The trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court, in its sentencing order, found four aggravating circumstances to exist: (1) that the murder was committed during a kidnapping, see § 13A-5-40(a)(1),

44

Ala. Code 1975; (2) that the murder was committed during a robbery, see § 13A-5-40(a)(2), Ala. Code 1975; (3) that Gaston committed the capital offense while under a sentence of imprisonment, see § 13A-5-49(1), Ala. Code 1975; and (4) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. (C. 129.)

The trial court also "considered all of these mitigating circumstances":

"The defense offered testimony and evidence that the following statutory mitigators were applicable: (1) The defendant has no significant history of prior criminal activity pursuant to Section 13A-5-51(1); (2) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor pursuant to Section 13A-5-51(4); (3) The defendant acted under extreme duress or under the substantial domination of another person pursuant to Section 13A-5-51(5); (4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired pursuant to Section 13A-5-51(6); and (5) The age of the defendant at the time of the crime pursuant to Section 13A-5-51(7).

"The defense further offered evidence and testimony under Section 13A-5-52. This evidence and testimony consisted of information about the defendant's activity while incarcerated. Evidence was presented that the defendant has participated in classes to improve himself in prison. Testimony was given that he is a loving father. Defendant's partner testified that they have started a social justice

45

organization. In addition, it was emphasized that there was no evidence that defendant was the person that inflicted the fatal wound on the victim."

(C. 129-30.)

The trial court then sentenced Gaston to death, concluding:

"After considering the evidence presented, the arguments of counsel, the report prepared by Pardons and Paroles, the jury's verdict, and after weighing the aggravating circumstances against the mitigating circumstances, this court finds that the aggravating circumstances outweigh the mitigating circumstances.

"This court has sworn to uphold the law of this State, and this is a duty that it does not take lightly. It is never easy to recommend the taking of the life of another person; however, the law requires it in this case."

(C. 130.)

The trial court's sentencing order shows that it properly weighed the aggravating circumstances and the mitigating circumstances and that it correctly sentenced Gaston to death. The record supports its findings.

Section 13A-5-53(b)(2), Ala. Code 1975, requires this Court to reweigh the aggravating and mitigating circumstances to determine whether Gaston's death sentence is appropriate.

"Section 13A-5-48, Ala. Code 1975, provides:

"'The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e)[8] of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.'

"'The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.' Ex parte Clisby, 456 So. 2d 105, 108-09 (Ala. 1984). '[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party.' Lawhorn v. State, 581 So. 2d 1159, 1171 (Ala. Crim. App. 1990) .... 'The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority.' Smith v. State, 908 So. 2d 273, 298 (Ala. Crim. App. 2000)."

---

[8]Act No. 2017-131, Ala. Acts 2017, amended § 13A-5-46(e)(2) and § 13A-5-46(e) to make the jury's verdict no longer advisory, and the act removed § 13A-5-47(e), Ala. Code 1975, which placed the final sentencing decision with the trial court. The decision in Stanley applied the versions of those subsections in effect before the 2017 amendment, and those versions in effect before 2017 apply to Gaston's case because he was charged before the effective date of the 2017 amendment. See Yeiter v. State, [Ms. CR-18-0599, June 28, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024).

Stanley, 143 So. 3d at 333. We agree with the trial court's findings, and, after independently weighing the aggravating circumstances and the mitigating circumstances, this Court holds that Gaston's death sentence is appropriate.

Under § 13A-5-53(b)(3), Ala. Code 1975, this Court holds that Gaston's death sentence is not excessive or disproportionate when compared to the penalty imposed in similar cases. See Smith v. State, [Ms. CR-2022-0504, June 28, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024) ("Sentences of death have been imposed for similar crimes in Alabama. See Gaddy v. State, 698 So. 2d 1100, 1150 (Ala. Crim. App. 1995) ('Two-thirds of all death cases in Alabama involve murders that occur during the course of a robbery.'). See also Shanklin v. State, 187 So. 3d 734 (Ala. Crim. App. 2014) (robbery and burglary); Mills v. State, 62 So. 3d 553 (Ala. Crim. App. 2008) (robbery); Sale v. State, 8 So. 3d 330 (Ala. Crim. App. 2008) (kidnapping); Lewis v. State, 24 So. 3d 480 (Ala. Crim. App. 2006) (kidnapping); and Wilson v. State, 142 So. 3d 732 (Ala. Crim. App. 2010) (especially-heinous-atrocious-or-cruel capital murder committed during a robbery and burglary).").

Finally, although no longer required to do so by Rule 45A, Ala. R.

48

App. P., we have reviewed the record and have found no plain error that may have adversely affected Gaston's substantial rights.

## CONCLUSION

The judgment of the trial court is affirmed.

Windom, P.J., and Cole and Anderson, JJ., concur. Kellum, J., concurs in the result.